**Jackie P. WHITTINGTON, administratrix of the estate of Claudette E. Milton, deceased, and Kadijah Nicole Woods, individually, in her own right, Appellees,**

v.

**EPISCOPAL HOSPITAL, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 19, 2000.

Filed Feb. 12, 2001.

Anna Marie S. Bryan, Philadelphia, for appellant.

Emmanuel O. Iheukwumere, Philadelphia, for Wittington, appellee.

Before McEWEN, President Judge, CAVANAUGH, J. and CIRILLO, President Judge Emeritus.[*]

CAVANAUGH, J.:

¶ 1 Episcopal Hospital appeals from the December 21, 1999, order of the trial court which denied its motion for post-trial relief requesting judgment notwithstanding the verdict ("JNOV") or, in the alternative, a new trial and granted appellees' motion for entry of judgment on the jury's verdict as molded by the court to reflect the addition of delay damages. Upon review, we affirm.

¶ 2 This case results from the death of appellees' decedent, Claudette E. Milton, from a medical condition known by all of the following titles: pre-eclampsia, toxemia, or pregnancy induced hypertension ("PIH"). The facts seen most favorably to appellee in accordance with our review are as follows:

¶ 3 The decedent became pregnant and throughout her pregnancy was treated by Dr. Carol Allen, a specialist in obstetrics and gynecology, who was practicing at Episcopal Hospital and at Vanguard OB/GYN Associates in Philadelphia. Decedent was also treated at Episcopal Hospital by Episcopal's resident physicians and nursing staff.

¶ 4 On December 15, 1993, decedent saw Dr. Allen for her continuing pre-natal care. An evaluation of decedent indicated that her blood pressure was elevated. A urine dipstick test also indicated a +2 proteinuria. Dr. Allen ordered a non-stress test ("NST"), biophysical profile, and another blood pressure check at Episcopal Hospital after which decedent was to be released. Decedent went to Episcopal Hospital on the same day where resident physician Dr. DeSilva performed the NST and checked her blood pressure. Additionally, decedent complained of lightheadedness, abdominal swelling, heartburn, and leg pain. Dr. DeSilva ordered a PIH work-up and, consistent with decedent's symptoms, diagnosed her with PIH. Notwithstanding the PIH diagnosis and the need to have labor induction initiated immediately, Dr. DeSilva sent decedent home with only a prescription for iron supplements, which did not relate to the treatment of PIH. No one at Episcopal advised decedent of the risks of PIH, even in light of a documented family history of PIH.

¶ 5 On December 22, 1993, decedent again visited Dr. Allen, this time with complaints of irregular contractions. Her cervix was 1cm dilated and fifty percent effaced. Dr. Allen ordered a NST and urine dipstick at Episcopal Hospital after which decedent was to be released. The NST and urine dipstick were performed that day by Episcopal's nurses and physicians. The dipstick was again +2 proteinura, while the blood pressure checked 170/100. Laboratory tests were not ordered. Notwithstanding the clearly elevated blood pressure and dipstick results, which should have mandated the immediate initiation of labor induction, Episcopal's staff neither

[*] P.J.E., Cirillo did not participate in the disposition of this case

admitted Ms. Milton, nor even questioned Dr. Allen's instructions that she should go home and wait until December 23, 1993 for labor induction. Further, Episcopal's staff did not apprise decedent of any dangers she may have been facing due to PIH despite her diagnosis on December 15, 1993, and her elevated blood pressure both on December 15, 1993 and on December 22, 1993.

¶ 6 On December 23, 1993, decedent arrived at Episcopal Hospital for induction of labor and, according to the testimony of the nurse on duty and the nursing note, was admitted 7:30 a.m. Upon admission, decedent was kept in a waiting room known as PM6 until 9:00 p.m. instead of being admitted immediately to the labor and delivery room as provided for by Episcopal's policy. At the time of admittance, Episcopal's resident physician, Dr. Ellen G. Wood, noted that decedent had a family history of PIH and that she was complaining of a headache but ordered no lab work. While in PM6, decedent should have been thoroughly evaluated every three to four hours but was essentially ignored for close to 14 hours.

¶ 7 At 9:00 p.m., decedent, still in the waiting area, complained of headaches and her blood pressure elevated to 181/100. At this time, she was finally transferred to labor and delivery for induction. Once in labor and delivery, the resident physician and nursing assessments showed consistently elevated blood pressure throughout the night but blood pressure lowering drugs, essential for her condition, were not ordered until approximately 7:00 a.m. the next morning. However, decedent did not receive the prescribed drugs until 8:40 a.m. By this point, decedent's condition had deteriorated.

¶ 8 At or about 11:30 a.m. on December 24, 1993, Ms. Milton was rushed to the operating room for an "emergency" C-section. However, the procedure was delayed for at least an hour and performed under clearly unfavorable conditions. Despite her obesity and severe pre-eclampsia, Episcopal's obstetrical physicians and nurses did not order the necessary deep vein thrombosis prophylaxis, such as the initiation of heparin therapy or even put antithrombin hoses on decedent. This omission resulted in the formation of blood clots in decedent's lungs and onset of pulmonary edema, a complication of severe preeclampsia accompanied by the filing of the lungs with fluid.

¶ 9 Decedent briefly regained consciousness following her C-section, but soon thereafter her condition deteriorated, resulting in her being placed on a ventilator. Decedent was transferred to the intensive care unit ("ICU") but remained under the care of the OB/GYN division, which violated another hospital policy. While in the ICU, decedent initially improved then deteriorated again. Throughout her stay in the ICU, decedent's endotracheal tube was consistently malpositioned. Moreover, decedent was not diagnosed with multiple pulmonary emboli, and Episcopal's residents and nurses again failed to timely order the appropriate deep thrombosis prophylaxis. Decedent developed Adult Respiratory Distress Syndrome ("ARDS") and died on January 4, 1994 at the age of 26.

¶ 10 The medical care surrounding decedent's pregnancy and death led appellees to institute litigation in December of 1995, naming Episcopal, all non-Episcopal medical personnel who attended to decedent at either Episcopal Hospital or at Vanguard Associates, decedent's insurance provider, and the insurer's medical quality control management organization as defendants. Prior to trial, some defendants were dismissed, and appellees entered into a joint tortfeasor release with all of the remaining defendants except Episcopal.[1] The trial

1. The settlement released the following original defendants: Dr. Allen, three Vanguard associates (Dr. Bradman, Dr. Amores, and Dr. Wood), and the CAT Fund. Meanwhile, the following original defendants: Dr. Zelenkofske, Dr. Varada, Treston (nurse anesthe-

court allowed the jury to hear evidence relating to decedent's entire course of medical care in order to render a verdict apportioning total responsibility among Episcopal and the settling defendants. In July of 1999, an eight day jury trial culminated in a verdict in favor of the appellees in the sum of $1,100,000 which was comprised of a $200,000 award in a wrongful death action and a $900,000 award in a survivor action. The jury apportioned liability as follows: Episcopal Hospital, fifteen percent (15%) directly liable for corporate liability and ten percent (10%) for vicarious liability.[2] Thus, the verdict, as molded, against Episcopal Hospital aggregated $275,000 ($50,000 as the wrongful death action and $225,000 as to the survival action).[3]

¶ 11 Episcopal filed a motion for post-trial relief requesting JNOV or a reduction of its pro-rata share of the verdict in relation to its apportionment for corporate liability. Alternatively, Episcopal requested a new trial. Appellees also filed a post-trial motion which requested entry of judgment with delay damages. On December 20, 1999, the trial court denied appellant's motion in its entirety, awarded appellees the requested delay damages molding the verdict appropriately, and entered judgment in favor of appellees in the amount of $339,050.24.

¶ 12 From the entry of judgment, appellant filed this instant appeal on January 20, 2000. On March 30, 2000, appellant filed an application for remand for amendment of judgment and to stay briefing schedule with this court. This court denied appellant's application for remand by order on May 8, 2000.[4]

¶ 13 Appellant has raised the following issues, verbatim, for our review:

I. Whether Episcopal Hospital is entitled to a judgment notwithstanding the verdict as to Plaintiff's corporate negligence claim because the testimony of Plaintiff's obstetrical expert failed to establish a *prima facie* case of corporate negligence?

II. Whether Plaintiff's obstetrical expert was qualified to render opinion testimony against the Hospital as to its alleged corporate negligence?

III. Whether a new trial is required because the Trial Court allowed the Plaintiff's obstetrical expert to render an opinion testimony as to the Hospital's corporate negligence?

IV. Whether Plaintiffs are entitled to recover the excess $75,000 verdict returned against Episcopal Hospital where they executed a Joint Tortfeasor Releasing the Hospital's excess insurer, the CAT Fund, from further recovery, the

---

tist), Keystone Health Plan East, and Health Partners were released either by stipulation or summary judgment.

2. Dr. Carol Allen was the only other named defendant to be found liable and was apportioned 75% of the responsibility. The jury found in favor of the other remaining defendants: Ellen Wood, D.O., Ita Brandman, M.D., Rebecca Amores, M.D., and the resident OB/GYN physicians at Episcopal Hospital.

3. The trial court also molded the verdict to reflect that appellees cannot recover the $825,000 jury verdict against Dr. Allen by virtue of her inclusion to the joint tortfeasor release, *supra* at 5.

4. On January 20, 2000, the same day it filed a notice of appeal, Episcopal filed an emergency petition with the trial court to modify the terms of the supersedeas bond required to stay execution of the judgment pending appeal. The trial court modified the terms of the bond on January 28, 2000, and when appellant requested reconsideration of the modified terms, the trial court again modified the terms on February 4, 2000. On March 30, 2000, Episcopal filed an application for remand for amendment of judgment which attempted to piggyback the reduction in the amount of supersedeas bond into some type of post-trial modification or reduction of the judgment amount. This Court denied the application by order on May 8, 2000.

Hospital is not a party to the release and therefore, did not consent to or have knowledge of the CAT Fund's release of liability, and the Plaintiffs accepted money from the CAT Fund under the release?

¶ 14 Episcopal's primary contention is that appellees failed to make out a *prima facie* case of corporate negligence; therefore, Episcopal contends that it is entitled to judgment notwithstanding the verdict. Our standard of review is well settled and is as follows:

We will reverse a trial court's denial of a judgment notwithstanding the verdict ("JNOV") only when we find an abuse of discretion or an error of law that controlled the outcome of the case.

*Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa.Super.1999), *appeal denied,* 561 Pa. 698, 751 A.2d 192 (2000) (citing *Jones v. Constantino,* 429 Pa.Super. 73, 631 A.2d 1289 (1993)).

An order granting JNOV is appropriate if the movant is entitled to judgment as a matter of law and/or the evidence presented at trial was such that no two reasonable minds could disagree that the verdict would be in favor of the movant. With the former, the court is to review the record and determine whether, even with all factual inferences decided adversely to the movant, the law nonetheless requires a verdict in its favor. With the latter, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Robinson v. Upole,* 750 A.2d 339 (Pa.Super.2000); *Rohm & Haas Co. v. Continental Cas. Co.,* 732 A.2d 1236, 1247 (Pa.Super.1999) (quoting *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003, 1007 (1992)).

¶ 15 In *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703, 708 (1991), our supreme court first recognized the doctrine of corporate negligence as a basis for hospital liability. The doctrine creates a non-delegable duty upon the hospital to uphold a proper standard of care to a patient and will impose liability if the hospital fails to ensure a patient's safety and well being at the hospital. *Id.* In outlining the boundaries of the doctrine, the court held that a hospital is directly liable if it fails to uphold any one of the following four duties:

1. a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

2. a duty to select and retain only competent physicians;

3. a duty to oversee all persons who practice medicine within its walls as to patient care; and

4. a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Id.* at 707–708.

¶ 16 Here, appellees established that Episcopal failed to ensure the decedent's safety and well being at the hospital, thus breaching the standard of care owed to decedent. Specifically, Episcopal failed in its duty to oversee all persons who practice medicine within its walls as to patient care, the third duty enumerated in *Thompson. Id.* at 707.

¶ 17 In order to present a *primia facie* case of corporate negligence, appellees were required to introduce evidence of the following:

1. appellant acted in deviation from the standard of care;

2. appellant had actual or constructive notice of the defects or procedures which created the harm; and

3. that the conduct was a substantial factor in bringing about the harm.

*Welsh v. Bulger,* 548 Pa. 504, 698 A.2d 581, 586 (1997). Further, unless the hospital's negligence is obvious, an expert witness is required to establish two of the three prongs: that the hospital deviated from the standard of care and that such devia-

tion was a substantial factor in bringing about the harm. *Id.* at 585–586.

¶ 18 We begin by analyzing whether appellees' medical expert, Dr. Paul D. Gatewood, presented evidence that Episcopal's care deviated from the standard of care and whether that deviation was a substantial factor in bringing around the harm, i.e., decedent's untimely death. Review of the record shows that appellees elicited expert testimony that the hospital deviated from the standard of care imposed by law on the 15th, 22nd, 23rd, and 24th of December in 1993, as well as in rendering post delivery medical care to decedent.

¶ 19 Plaintiff's expert witness, Dr. Paul Gatewood, discussed the conduct of the nurses on December 15, 1993. He began by explaining that the nurses and resident physicians were employees of the hospital and were the agents through whose conduct hospital liability may attach. In answering whether their conduct conformed to the standard of care, he opined:

Again, as we've discussed earlier in this deposition, the nurses are trained in those complications of pregnancy. And PIH is an extremely common complication of pregnancy. To allow a patient to be discharged, recognizing nurses cannot order patients to be admitted or discharged, but allowing a patient to be discharged, knowing full well that she has been incompletely evaluated, **falls below accepted standards of nursing care as from an obstetrical point of view.** If the resident insisted on discharging this patient and the nurse, knowing full well that the evaluation requires the laboratory work to be on the chart and evaluated, requires the patient be evaluated for several hours for evaluation of her blood pressure, and the resident and/or the attending insists on discharging, then the nurse has the obligation to go to her supervisor and inform the supervisor of this problem that has developed. And the supervisor then takes it from there to resolve the conflict between appropriate nursing care and discharging of this patient. Its called chain of command. And it has been used. It should be used. And the chain of command can go all the way to the chairman of the department or the director of nursing. **So the nurses were wrong also and fell below accepted standards from an obstetrical standpoint,** in discharging this patient, who was at term and showing symptomatology, the classic symptomatology of toxemia or preeclampsia, and allowing this patient to go home.

N.T., 7/14/99, at 76–78 (emphasis added).

¶ 20 When questioned, to a reasonable medical certainty, whether this deviation from the standard of care was a substantial factor in causing Ms. Milton's death, the doctor opined:

Yes, sir. This patient was term; she was sick; she had PIH, pregnancy-induced hypertension. She had the preeclamptic form. And she presented with elevated blood pressures, two-plus proteinuria and edema. That's the triad of preeclampsia. This patient needed to be delivered. By allowing the patient to go home and returning to the hospital eight or nine days later for an induction, at which time there was no notation at all about the pregnancy-induced hypertension, allowed the disease process to continue. Preeclampsia is not you have it one day and you don't have it the next week. It is a progressive disorder. And by not placing the patient in the hospital, ordering-attempting an induction, which, in my opinion, would have failed anyway because of the size of the baby and the size of the mother, the patient would have had a Caesarian section, there would have been good control, and in all probability, the blood pressure crises that occurred later on would not have happened. This was the first major-this was the first notation of increased blood pressure. **And had they, in all probability, acted at that time, this patient would have had a**

**successful delivery, and would be alive today.** By allowing this patient to go home and delaying treatment, the disease progressed to the point that it became **fulminant[5] preeclampsia.** While she was in labor, she went into the complications of pulmonary edema, required a C-section under the absolute worst of circumstances, blood pressure out of control, pulmonary edema. **And the rest is history with the complications incurred by this patient post-operatively.**

N.T., 7/14/99, at 80–82 (emphasis added).

¶ 21 Moving along chronologically, the doctor opined about Episcopal's deviation from the standard of care on the December 22, 1993, when he stated:

At the time she was admitted on the 12/22/93, she was again with fulminate toxemia. **She needed to be admitted, stabilized, immediately induced or a C-section, if induction was not possible, to get the baby out and to stop the process of preeclampsia. And that was not done.**

N.T. 7/14/99, at 98 (emphasis added).

The doctor found this deviation, too, was a substantial factor of decedent's death, stating:

Again, even though we are now beyond the point where she should have been delivered, if she had been admitted on the 15th, but toxemia is a progressive problem. **Again, had they started the induction at that time and had they seen there was a failure in progress, in all probability, the fulminate aspect of the toxemia would not have occurred so rapidly.** And in addition to that, with the morning admission to the hospital, if indeed the blood pressures did start to increase, it would have been immediate for a Cesarean section delivery. So it was another 24–hour delay in

the patient being treated for progressive problem, which is the toxemia.

N.T., 7/14/99, at 98–100 (emphasis added).

¶ 22 From the time decedent presented herself at Episcopal for admission to proceed for induction of labor on December 23rd until delivery of the baby on December 24th, the standard of care did not improve. When decedent arrived at the hospital on the morning of December 23, 1993, a review of her records would have showed her prognosis of PIH and necessitated that she be sent immediately to labor and delivery for induction; instead, Episcopal ignored her records and sent decedent to waiting area, PM6, which violated the hospital's own policy and was a deviation from the standard of care. The doctor opined:

All of that information was readily available and mandatory to be reviewed in a patient who presents at 350 pounds at 42 weeks for an induction. **None of that was done. And that is a deviation, number one, by anyone and everyone that had anything to do with the patient from the time of 7:30 on.**

N.T., 7/14/99, at 104 (emphasis added).

As to the treatment rendered after decedent's placement in PM6, the doctor testified in pertinent part:

First of all is the admission of the patient to PM6, because it's in direct violation of the protocol.

. . .

The failure of the residents and/or nurses to assure adequate basic every three-four hour vital signs on this patient while she is in the PM6 unit, none of those were done. The failure to contact the physician for the expediency of getting this patient induction started.

. . .

**So the whole scenario of the lack of management, lack of documentation** completely out of hand. N.T., 7/14/99, at 100.

---

5. "Fulminate", meaning that it is now getting

of the care of this patient falls below acceptable standards of care.

N.T., 7/14/99, at 110–113 (emphasis added).

¶ 23 The cumulative result of all Episcopal's negligent treatment before and after admission into Episcopal on the 23rd for induction was described as follows:

And as a direct result, this patient ended up having that C-section under the worst of conditions. And those actions, in my opinion, directly contributed to the final outcome of this case.

N.T., 7/14/99, at 113 (emphasis added). And also:

And by the time they finally delivered this patient, it was not only fulminate, **it was life threatening,** because the patient was so sick. She now had her lungs filled with fluid, called pulmonary edema; she's having a major operation in the worst possible circumstances, with blood pressures out of control, pulmonary edema, fluid in the lungs, a baby that's in trouble. **This is the worst case scenario one could put yourself into. And it did not have to happen.**

N.T., 7/14/99/, at 100 (emphasis added).

¶ 24 Lastly, the post-operative care fell below the standard of care and was a causal factor in decedent's death from pulmonary embolism. After the emergency C-section, decedent, who was very sick and morbidly obese, needed a prolonged period in bed with ventilator assisted breathing. During this time, the risk of deep venous thrombosis is significantly well known. As to the standard of medical care rendered, the doctor opined:

My comments are and the deviations are that this patient-it was mandatory that this patient, who was gong to be in bed on respirator therapy and anticipated for a prolonged period of time, have appropriate deep veinous vein—deep venous thrombosis prophylaxis started immediately. And by that I mean the antithrombotic hose and subcutaneous Heparin.

. . .

And it was the responsibility of the obstetrician and the obstetrical residents and the nurses, knowing fully well that this is a major risk factor of a Cesarean section in an acutely ill patient, to provide the minimum prophylaxis to prevent deep venous thrombosis. And that is putting on the antithrombin and the doctors to initiate Heparin therapy. And this was not done.

N.T., 7/14/99, at 114–116 (emphasis added).

Dr. Gatewood concluded that the failure to use such safeguards was a cause of death, stating:

If you take a morbidly obese patient now and put her in the bed situation after pelvic surgery, without antithrombin therapy, and you're a setup, and as happened in this case-for deep venous thrombosis and a pulmonary embolus.

N.T., 7/14/99, at 122 (emphasis added).

¶ 25 Appellees also offered a pulmonary specialist, Gary H. Miller, M.D., who supplemented the findings and testimony of Dr. Gatewood regarding the post delivery medical care Episcopal rendered to decedent. Pertinent to establishing a deviation from the standard of care and it causal relation to decedent's death, the doctor opined that decedent had pulmonary edema for some time stating:

I think the pulmonary edema was a complication for delivery of both her preeclamptic condition and the delivery, and was fairly well-established at the time of her distress was one of the reasons for a cesarean section.

N.T., 7/19/99, at 13.

Regarding whether deep vein thrombosis was needed, the doctor opined:

It would reduce the risk to a significant extent. And it's hard to give exact numbers to what that extent would be in this case. However, it would have reduced the risks of clot. And a reduction

in the risks might have resulted in the event not happening.

N.T., 7/19/99, at 51 (emphasis added).

As a result of Episcopal's failure to render deep veinous thrombosis, the doctor opined:

> It is my belief that the failure to start DVT prophylaxis earlier than $^{12}/_{28}$, increased the risk of complications; namely, pulmonary emboli, that the patient subsequently suffered. And I believe that the complications of pulmonary emboli was, in fact, the cause of her death.

N.T., 7/19/99, at 32 (emphasis added).

¶ 26 It is clear that Dr. Gatewood, independently and in conjunction with Dr. Miller, testified to a reasonable degree of medical certainty that Episcopal committed numerous and recurring deviations from the standard of care and that these deviations were a substantial cause of decedent's death. We now proceed to the final requirement under *Thompson, supra,* whether the hospital had actual or constructive notice of the defects or procedures creating the injury.[6]

¶ 27 Preliminarily, we note that much of appellant's argument on the issue of notice is misgrounded as Episcopal failed to remain cognizant that it was found liable for failing in its duty to oversee all persons who practice medicine within its walls as to patient care, the third general duty under *Thompson. Id.* at 707–708. Episcopal attempts to show that appellees' *prima facia* case is legally deficient under either the second duty under *Thompson,* which imposes a duty to select and retain only competent physicians, or the fourth duty under *Thompson,* which imposes a duty to formulate, adopt and enforce rules and policies to ensure quality care for the parties.[7] *Id.* While some of Episcopal's nu-

---

6. Some of Episcopal's argument is mistakenly built around the claim that an expert is needed to establish notice. First, this claim is wrong. Expert testimony on notice, while helpful, is not a prerequisite to establish a *prima facie* case. In *Welsh,* this Court outlined the expert witness requirements when it stated that "unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from the standard of care and that the deviation was a substantial factor in causing the harm to plaintiff." *Id.* at 585–586. Further, Dr. Gatewood's testimony certainly established notice, even though he did not use certain magic words, and would be sufficient if expert testimony were mandated. *See Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990)(this court looks to the substance of expert testimony and does not require them to use "magic words"). Finally, the trial court could have excused any expert witness requirement on the notice issue because Episcopal's lack of supervision was obvious and within the ken of the average layperson. *See Mitzelfelt,* 584 A.2d at 894; *Welsh,* 698 A.2d at 585.

7. Episcopal's confusion, first illustrated in its brief, was compounded during oral argument when it insisted that *Boring v. Conemaugh Memorial Hospital,* 2000 PA Super 205, 760 A.2d 860 was determinative of our instant matter. The *Boring* court reviewed a trial court's refusal to give a jury instruction on corporate negligence on the basis that the plaintiff did not establish that the hospital had failed to adopt or enforce adequate policies, the fourth duty under *Thompson.* Here, we are reviewing a trial court that found appellees had established that the hospital failed in overseeing all persons who practice medicine within its walls as to patient care, the third duty under *Thompson.* More importantly, the *Boring* court stated that appellant failed to present any systematic negligence and their theory focused solely on failure to implement the chain of command theory during one instance; thus, the evidence supported only a charge on vicarious liability. *See id.* at ¶ 5–9. Here, there are numerous instances of failures to follow or enforce policy and/or utilize a chain of command. This negligence is supplemented by a complete lack of management and supervision on a continuing and recurring basis covering multiple hospital departments and a multitude of medical personnel over an extended period. The cumulative nature of this evidence allowed the trial court to determine that a *prima facia* case of corporate negligence had been established by Episcopal's failure to oversee all its medical personnel. In the process, the trial court avoided analyzing whether corporate negligence was established strictly on Episcopal's failure to form and enforce policies, the rational examined in *Boring.*

merous negligent acts/omissions would help support a finding of corporate negligence under more than one of the four enumerated duties, our review concerns the cumulative nature of the conduct used to establish corporate negligence under the third duty in *Thompson.* The relevant findings of the trial court establish that Episcopal had the actual or constructive notice needed to establish corporate negligence.

¶ 28 We begin by clarifying the "systematic negligence" standard espoused by Episcopal throughout these proceedings. *See Edwards v. Brandywine Hospital,* 438 Pa.Super. 673, 652 A.2d 1382, 1386–1387 (1995)(stating that a hospital is not liable under corporate negligence just because one of its employees makes a mistake that constitutes malpractice but that the tort contemplates a kind of systematic negligence). Here, the trial court performed an extensive analysis, which need not be recounted, on why proving "systematic negligence" as mentioned in *Edwards* is not a mandatory requirement but is an adequate way to establish notice and was a way appellees established notice. Trial Court Opinion, 2/3/00, at 6 9. After reviewing that analysis, Episcopal, on appeal, concedes that the systematic negligence standard in *Edwards* is merely another way of saying that the hospital entity itself must have actual or constructive knowledge of a deviation of a standard of care but that it lacked the requisite notice under any standard. Appellant's Brief at 21. We agree that "systematic negligence" need not be proved to establish a *prima facie* case of corporate negligence but we disagree with Episcopal's contention that it cannot be charged with actual or constructive notice.

¶ 29 While appellant continues to argue that it had no actual notice, it offers no reason why constructive notice cannot or should not be imposed. Appellant may

properly be charged with constructive notice since it should have known of the decedent's condition. *See Edwards,* 652 A.2d at 1387 (to make out a viable *Thompson* claim, a plaintiff must prove that hospital knew or should have known of the mistake or deficiency). In *Welsh,* our supreme court found that a *prima facie* case of corporate negligence had been established when plaintiff's expert opined that the hospital's nurses must have known there was a problem but failed to act on that knowledge.[8] *Welsh,* 698 A.2d at 584. As in *Welsh,* appellant here is also liable since it must have known what was going on but failed to act. Further, constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. Had Episcopal undertaken adequate monitoring, it would have discovered that decedent had received and was continuing to receive medical treatment that was clearly deficient before and after her delivery. We are compelled to find constructive notice under these circumstances.

¶ 30 Since appellees made out a *prima facie* case of corporate negligence, the trial court correctly allowed the matter to go to the jury. Because the jury's verdict is consistent with the substantive evidence, the trial court committed no error by denying appellant's request for JNOV on this ground.

¶ 31 Episcopal next argues that appellees' expert, Dr. Paul Gatewood, was not competent to testify as an expert witness regarding the corporate negligence claim. Because the trial court allowed appellees' expert to testify, Episcopal claims it is entitled to JNOV or, in the alternative, a new trial.

¶ 32 While the standard of review for JNOV is the same, *supra* at 8, the standard of review of a trial court's deci-

8. The *Welsh* court did not specify whether the hospital was charged with actual or construc-

tive notice. *See Welsh,* 698 A.2d at 584.

sion to deny a motion for a new trial is as follows:

> Trial courts have broad discretion to grant or deny new trials and each review of a challenge to a new trial order must begin with an analysis of the underlying conduct or omission by the trial court that formed the basis for the motion. There is a two-step process that a trial court must follow when responding to a request for a new trial. *Morrison v. Dept. of Public Welfare, Office of Mental Health,* 538 Pa. 122, 646 A.2d 565, 570–571 (1994). First the trial court must decide whether one or more mistakes occurred at trial. Second, if the trial court determines that a mistake occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. *Spang & Co. v. U.S. Steel Corp.,* 519 Pa. 14, 545 A.2d 861, 868 (1988). It is well-settled law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with a trial court's authority to grant or deny a new trial. *Id.* at 865; *Morrison* at 570.

*Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116, 1121–1122 (2000)

¶ 33 We begin by reviewing Pa.R.E. 702, which controls testimony by expert witnesses and states:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Appellant agrees that the test of whether a witness meets the threshold to testify is very liberal. *See* Appellant's Brief at 24 (the standard for qualifying an expert in Pennsylvania is very liberal). Our supreme court qualified it as follows:

> The test to be applied when qualifying a witness to testify as an expert witness is whether the witness has **any reasonable**

**pretension to specialized knowledge on the subject under investigation.** If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.

*Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525, 528 (1995) (emphasis added).

¶ 34 Here, appellants rely completely on *Lavish v. Archbold Ladder Co.,* 39 D & C 4th 455 (Pa. C.C.P.1999), *aff'd,* 748 A.2d 783 (Pa.Super.1999), *cert. denied,* 563 Pa. 646, 758 A.2d 1200, 2000 PA. Lexis 1237 (2000), for the proposition that Dr. Gatewood was improperly allowed to render opinions on corporate negligence. *Lavish* concerns the breakage of a wooden ladder while Plaintiff was standing on the third step of the ladder. The expert in question had neither worked for companies manufacturing wooden ladders, nor acquired familiarity with wood products. He twice admitted he was wrong and that the opposing expert's report was accurate. Finally, the expert admitted that "he is not an expert on wood products" and that he "lacks expertise in ladder design or manufacturing." *Id.* at 462–463.

¶ 35 Contrary to the unqualified expert in *Lavish,* an examination of Dr. Gatewood's curriculum and/or his own *voir dire* testimony, shows the following: that he has been board-certified in obstetrics and gynecology, the precise medical field involved in this lawsuit, since 1976; that he is an attending obstetrician/gynecologist in three major hospitals during which he has supervisory duties regarding the physicians and nurses who assist him as an attending physician; that he holds an academic appointment at Northeastern Ohio College of Medicine; and that he has consistently encountered and treated high risk patients, including those with PIH like the decedent. These characteristics qualify Dr. Gatewood to render expert opinion. Thus, the trial court was correct in finding Dr. Gatewood qualified and in permitting him to render opinions on the issue of a

hospital's corporate liability. Trial Court Opinion at 21 (citing *McDaniel v. Merck, Sharp & Dohme,* 367 Pa.Super. 600, 533 A.2d 436 (1987); *Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649 (1996); Pa. R.E. 702); *see also Montgomery v. South Philadelphia Medical Group,* 441 Pa.Super. 146, 656 A.2d 1385, 1388 (1995)(physician may testify about the breach of a duty by a physician's assistant since knowledge about the care and treatment of patients which may be possessed by a physician's assistant is also knowledge generally possessed by a medical doctor).

¶ 36 Because the trial court was correct in admitting Dr. Gatewood's testimony and allowing the trier of fact to determine its weight, we find that Episcopal is not entitled to JNOV or a new trial.

¶ 37 Episcopal's final contention concerns the joint tortfeasor release, *supra* at 5, entered into before trial between appellees and all then remaining defendants including the CAT Fund, Episcopal's excess insurance carrier, but excluding Episcopal. By releasing the CAT Fund, Episcopal argues that appellees have agreed to limit Episcopal's liability to its primary insurance limits. Thus, Episcopal claims that the verdict in excess of $200,000, here $75,000, cannot be recovered from it. We first note that Episcopal is raising this issue for the first time on appeal; thus, the issue may not be adjudicated on appeal. *Fred E. Young, Inc. v. Brush Mountain Sportmen's Ass'n,* 697 A.2d 984, 993 (Pa.Super.1997); *See Amicone v. Shoaf,* 423 Pa.Super. 281, 620 A.2d 1222, 1225 (1993) (since appellant failed to raise the issue in its post-trial motions it is waived); Pa.R.A.P. 302(a).

¶ 38 Episcopal admits that its post trial motion failed to argue that its liability should be limited to its primary insurance coverage of $200,000. Appellant's Brief at 38. Nevertheless, Episcopal contends its failure to preserve the issue is excusable since it did not know the issue existed in time to preserve it for appeal. The argument is premised upon the mistaken belief

that the joint tortfeasor release, *supra* at 5, limited Episcopal's liability to $200,000 and the CAT Fund, as excess insurer, would pay any excess verdict. Episcopal contends it did not and could not correct its errant belief until after the submission of post-trial briefs when an employee of the CAT Fund told Episcopal that the intent of the tortfeasor release was to cap Episcopal's liability but the release, as drafted, may not contain an upper limit to Episcopal's pro-rata share of liability. Appellant's Brief at 38. Simply stated, unless and until the coverage issue is decided by a trial court it is not appropriate for our review.

¶ 39 Episcopal was given a copy of the proposed release pre-trial. This proposed release is the final release, verbatim, except for the addition of the appropriate signatures. The release was also discussed during an in-chambers meeting with the trial judge and Episcopal obtained a copy of the final release before the post-trial hearing. The identical provisions of the proposed and actual release read, in relevant part, as follows:

11. **It is understood that I, Jackie P. Whittington, am not hereby releasing any claims or demands that I have against Episcopal.**

12. It is further understood and agreed, however, that if it should be determined that Episcopal Hospital is jointly liable to the plaintiffs with any person or entity herein released, in tort or otherwise, **the claim and damages recoverable from Episcopal Hospital shall be reduced by the amount determined by the sum of the pro-rata share of legal responsibility or legal liability for which the parties herein released are found to be liable as a consequence of the foresaid medical care or treatment.**

R.R. at 403a (emphasis added). Since Episcopal had knowledge of the settlement

and its terms before and during trial, it had the obligation to raise any issue derived from the settlement agreement· in their post-trial motion. Their failure to do so results in waiver for purposes of this appeal.

¶ 40 Moreover, had the argument been preserved it would not be ripe for this court to review. The argument's foundation is that the CAT Fund and/or appellees impermissibly negotiated Episcopal's statutory right to excessive coverage away by releasing the CAT Fund, as excess insurer, from further liability without capping Episcopal's liability to its primary insurance limits. Episcopal contends this cannot legally be done without its consent and it remains liable for only the first $200,000 of the jury verdict against them. In order to gauge the merits of this contention and then issue a binding resolution upon all interested parties to this matter, the CAT Fund is a necessary party.

¶ 41 Judgment affirmed.