**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LESLEY COREY, AS ADMINISTRATRIX OF THE ESTATE OF JOSEPH COREY, AND LESLEY COREY, IN HER OWN RIGHT | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : : | |
| | : | |
| v. | : : | |
| | : | |
| WILKES-BARRE HOSPITAL COMPANY, LLC, D/B/A WILKES-BARRE GENERAL HOSPITAL, WILKES-BARRE GENERAL HOSPITAL EMERGENCY DEPARTMENT AND J. CHARLES LENTINI, M.D. | : : : : : : : | |
| | : | |
| v. | : : | |
| | : | |
| PENNSYLVANIA PHYSICIANS SERVICES, LLC | : : : | |
| | : | |
| Additional Defendant | : | No. 507 MDA 2021 |

Appeal from the Judgment Entered March 24, 2021
In the Court of Common Pleas of Luzerne County
Civil Division at No(s):  2015-07551

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KUNSELMAN, J.:        **FILED: JANUARY 20, 2023**

Appellant, Lesley Corey, as administratrix of the estate of Joseph Corey,

and Lesley Corey, in her own right, appeals from the judgment entered in the

Luzerne County Court of Common Pleas, in favor of Appellee, Wilkes-Barre

Hospital Company, LLC, d/b/a Wilkes-Barre General Hospital (the Hospital").[1] We reverse and remand for a new trial against the Hospital.

The relevant facts of this appeal are as follows. On August 8, 2013, Joseph Corey ("Decedent") experienced chest pain and difficulty breathing. During the early morning hours of August 9, 2013, Decedent called 911 and requested emergency medical assistance. Ambulances responded to Decedent's house and transported him to the Hospital, where Decedent was treated in the emergency department. Approximately twelve (12) hours later, Decedent was transferred to a different hospital, Milton Hershey Medical Center ("MHMC"), where he died on August 11, 2013.

Mrs. Corey commenced this action by filing a *praecipe* for writ of summons on July 1, 2015. On November 25, 2015, Mrs. Corey filed a complaint against the Hospital. The complaint included claims for wrongful death and survival based on the corporate negligence of the Hospital. The complaint also advanced a theory of vicarious liability. (**See** Complaint, filed 11/25/15, at ¶140; R.R. at 27a).

_____

[1] Appellant and J. Charles Lentini, M.D., reached a settlement prior to trial, and Dr. Lentini is not a party on appeal. (**See** Appellant's Brief 5). To the extent the caption also references "Wilkes-Barre General Hospital Emergency Department," the trial court noted that this entity "is neither a person nor a legal entity…." (Trial Court Opinion, filed 6/21/21, at 6; R.R. at 1120a). Consequently, the Hospital's *praecipe* for the entry of judgment requested the entry of judgment in its favor only, making no mention of the "Wilkes-Barre General Hospital Emergency Department." (**See** *Praecipe* for Entry of Judgment, filed 3/24/21, at 1; R.R. at 1106a).

On July 22, 2016, the Hospital filed a joinder complaint against PPS. The joinder complaint stated that the Hospital executed a contract for PPS to provide "the physicians, physician assistants and nurse practitioners" to staff the Hospital's emergency department. (Joinder Complaint, filed 7/22/16 at ¶9; R.R. at 57a). Thus, the Hospital asserted its "right to indemnification and/or contribution against [PPS] … for the amount of any judgment entered in favor of Mrs. Corey." (*Id.* at ¶22; R.R. at 61a).

The trial court opinion set forth the remaining procedural history of this appeal as follows:

> A jury trial was conducted beginning on October [2], 2020. On October 7, 2020, after the testimony of all of [Mrs. Corey's] liability witnesses, including her only medical liability expert, Ronald A. Paynter, M.D. (hereinafter Dr. Paynter), PPS moved for a compulsory nonsuit on all claims against it and [the Hospital] moved for a compulsory nonsuit with respect to [Mrs. Corey's] claim based on corporate negligence. [Mrs. Corey] did not oppose PPS's motion, however, [the Hospital] did. [Mrs. Corey] did oppose [the [Hospital's] motion, however, PPS did not. Ultimately, the court denied PPS's motion for a compulsory nonsuit but granted [the Hospital's]. As a result, [Mrs. Corey's] only claims remaining against [the Hospital] were those based on vicarious liability. [The Hospital's] claim against PPS seeking indemnification and/or contribution also remained.
>
> Trial resumed and, on October 15, 2020, following the court's instructions to the jury regarding the applicable law involved in the case and the closing arguments of counsel for the parties, the court … presented a verdict slip to the jury in which "Question No. 1" appeared as follows:
>
> **Question No. 1**
>
> Do you find that the conduct of anyone listed below fell below the standard of care. In other words, was

- 3 -

anyone listed below negligent?

Laura Bond, RN[2]           ___ Yes         ___ No

[PPS]                    ___ Yes         ___ No

**If you answer Question No. 1 "No" as to everyone, you have reached a verdict. The foreperson should sign the verdict slip and notify the tipstaff.**

**If you answer Question No. 1 "Yes" as to anyone, go to Question No. 2.**

The court specifically instructed the jury regarding "Question No. 1" as well [as] the other five jury verdict interrogatories that were included on the verdict slip. At the conclusion of the court's final instructions, the jury was left by themselves in the courtroom to deliberate (rather than retire to a separate room because of COVID restrictions in place at the time).

After approximately fourteen minutes of deliberation, the jury informed the court's tipstaff that they had reached a verdict. The parties who were present, counsel, and the undersigned returned to the courtroom. At no time prior to the jury announcing their verdict did counsel for any party raise an objection with respect to the length of time that the jury had deliberated. After the court reviewed the verdict slip and found it to be in order, the jury foreperson announced that the jury had answered "No" on "Question No. 1" as to both Laura Bond, RN and [PPS]. The request of [Mrs. Corey's] counsel to poll the jury was granted and it indicated that ten of the twelve jurors were in agreement with [the] verdict. The court directed that the verdict be entered of record and the jurors were dismissed.

_____

[2] As we will discuss in conjunction with Appellant's first issue, Nurse Bond, a Hospital employee, was the nurse who cared for Decedent following his admission to the Hospital's emergency department. (*See* Trial Court Opinion at 5; R.R. at 1119a).

On October 26, 2020, [Mrs. Corey] filed a motion for post-trial relief pursuant to Pa.R.C.P. No. 227.1 in which she requested a removal of the nonsuit with the respect to her corporate negligence claim, a "new trial on all issues of liability and damages" and the "scheduling of an evidentiary hearing with respect to issues of potential jury misconduct." Both [the Hospital] and PPS filed responses to the motion. All parties filed briefs, and oral argument on the motion was held before the court on December 23, 2020. Prior to the court ruling on the motion . . . [the Hospital], on March 24, 2021, entered judgment on the verdict pursuant to Pa.R.C.P. No. 227.4(1)(b).[3]

(Trial Court Opinion at 2-4; R.R. at 1116a-1118a) (some capitalization omitted). Mrs. Corey timely filed a notice of appeal on April 22, 2021. The trial court did not order a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Mrs. Corey now raises three issues for this Court's review:

[1]     Did [Mrs. Corey] present evidence of corporate liability sufficient to have required the trial court to deny a nonsuit motion by [the Hospital] and submit this claim to the jury?

[2]     Did [Mrs. Corey] present evidence of [the Hospital's] vicarious liability for the acts and omissions of attending physician, Dr. Perry, and its staff in general, sufficient to submit this claim to the jury as against the hospital itself on question 1 of the verdict slip.

---

[3] "Once a post-trial motion is timely filed, judgment cannot be entered until the trial court enters an order disposing of the motion or the motion is denied by operation of law one hundred and twenty days after the filing of the motion." *Melani v. Northwest Engineering, Inc.*, 909 A.2d 404, 405 (Pa.Super. 2006) (citing Pa.R.C.P. 227.4). Here, the trial court had yet to rule on Mrs. Corey's post-trial motion prior to the Hospital filing its *praecipe* for entry of judgment. Nevertheless, at the time when the Hospital filed its *praecipe*, more than 120 days had passed since the filing of the post-trial motion.

[3] Given the overall record of trial proceedings, should an evidentiary hearing have been conducted by the trial court to determine whether juror misconduct influenced the verdict?

(Appellant's Brief at 4).

In her first issue, Mrs. Corey insists that hospital personnel must "recognize and report abnormalities in the treatment and condition of [their] patients." (*Id.* at 35). Mrs. Corey relies on the testimony from her liability expert, Dr. Paynter, to establish that hospital personnel recognized Decedent's deteriorating condition, but they failed to take appropriate actions under the circumstances. She emphasizes that emergency department personnel knew that Decedent was tachycardic, with falling blood pressure, and elevated respirations. Relying on relevant case law, Mrs. Corey argues that Dr. Paynter's testimony established that the Hospital deviated from the applicable standard of care. Mrs. Corey concludes that the trial court should have submitted her corporate negligence claim to the jury, and the court committed reversible error by granting the Hospital's motion for a nonsuit.

Our standard of review for the grant of a nonsuit is as follows:

> In reviewing the entry of a nonsuit, our standard of review is well-established: we reverse only if, after giving appellant the benefit of all reasonable inferences of fact, we find that the factfinder could not reasonably conclude that the essential elements of the cause of action were established. Indeed, when a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture.

- 6 -

* * *

On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor. The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial. … The appellate court must review the evidence to determine whether the trial court abused its discretion or made an error of law.

**Munoz v. Children's Hospital of Philadelphia**, 265 A.3d 801, 805-06 (Pa. Super. 2021), *appeal denied*, 2022 WL 3366916 (Pa. 2022) (internal citations and quotation marks omitted).

Over thirty years ago, in **Thompson v. Nason Hosp.**, 591 A.2d 703 (Pa. 1991) our Supreme Court recognized four duties of care a hospital owes to a patient, independent of the duties owed by the doctors and staff, namely:

(1)    A duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

(2)    A duty to select and retain only competent physicians;

(3)    A duty to oversee all persons who practice medicine within its walls as to patient care; and

(4)    A duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

**Id**. at 707.

Although Mrs. Corey does not specifically identify in her brief which of these four duties the hospital breached in this case, her reliance on several

- 7 -

cases shows that she claims the hospital breached the third duty, *i.e.,* the duty to oversee all persons who practice medicine within its walls as to patient care.

First, she relies on **Thompson**.  Appellant's Brief at 33-40.  There, Linda Thompson was brought to the emergency room of Nason Hospital by ambulance, where she was admitted with head and leg injuries following an automobile accident.  Her husband advised the staff that she was taking coumadin, had a permanent pacemaker and that she took other medications.  The day after she was admitted, Mrs. Thompson was unable to move her left foot and toes.  Two days later, she had complete paralysis of her left side.  Ultimately, she was transferred to a different hospital, where upon discharge, she had not regained motor function of her left side.

She and her husband sued Nason Hospital for corporate negligence, claiming the hospital was negligent for failing to monitor her conditions during treatment.  The hospital claimed it had no duty to observe, supervise or control her actual treatment.  The Supreme Court of Pennsylvania disagreed, and, for the first time, expressly adopted the theory of corporate negligence with respect to a hospital: "We adopt as a theory of hospital liability the doctrine of corporate negligence or corporate liability under which the hospital is liable if it fails to uphold the proper standard of care owed its patients.  In addition, we fully embrace the aforementioned four categories of the hospital's duties."  **Id**. at 708.

The Thompsons argued that the hospital breached the third duty, *i.e.* failing to monitor the medical services provided to Linda Thompson. The High Court found there was a question of material fact as to whether the hospital was negligent in supervising the quality of care Mrs. Thompson received, such that summary judgment was not appropriate on the issue of corporate liability.

Next, Mrs. Corey relies on **Welsh v. Bulger**, 698 A.2d 581 (Pa. 1997) to support her claim. Appellants' Brief at 41-42. In **Welsh**, an infant died as the result of injuries negligently inflicted during delivery. Monitoring equipment indicated that the fetus was not receiving sufficient blood flow because the umbilical cord was compressed. Despite the indications that a cesarean section should be performed, the baby was delivered vaginally and suffered permanent injury. An expert report provided by the plaintiff indicated that the nurses should have known about the child's deteriorating condition and that their failure to notify hospital authorities resulted in the child's injuries.

Our Supreme Court held that, based on this expert report, the plaintiff had made a *prima facie* claim against the hospital for corporate negligence under **Thompson**. The Court said:

> In support of her claims for corporate negligence, [plaintiff] relies on the expert report of Dr. Warner. **She first claims this report establishes that the hospital was corporately negligent for the failure to monitor and report the child's condition, which is a violation of the duty to oversee all persons who practice medicine within its walls as to patient care, the third duty under Thompson**. Read in the light most favorable to [plaintiff] as the nonmoving party, the report shows that Dr.

> Warner opined that the nurses breached the standard of care because they must have known that there was a problem with the delivery but failed to act on that knowledge. Dr. Warner concluded that this breach was a substantial factor in bringing about the harm to the deceased when he concluded that if the nurses had notified the hospital of the need for a cesarean section, then the injury would not have occurred. Thus, Dr. Warner's report is sufficient to support a *prima facie* claim of corporate negligence for Nason Hospital's failure to oversee all persons who practice medicine within its walls as to patient care.

**Welsh**, 698 A.2d at 586 (footnote omitted) (emphasis added). Thus, in **Welsh**, the breach by the nurses of the duty to monitor and report was alone sufficient to support a claim of corporate negligence under the third duty announced in **Thompson**, *i.e.*, the failure to oversee all persons who practice medicine within its walls as to patient care.

Finally, Mrs. Corey relies on this Court's decision in **Whittington v. Episcopal Church**, 768 A.2d 1144 (Pa. Super. 2001) to support her claim of corporate negligence. Appellant's Brief at 44-45. In **Whittington**, a hospital patient's estate filed a wrongful death and survivor action against the hospital and others, after the patient died following complications while giving birth. **Whittington**, 768 A.2d at 1147. Decedent was admitted at 7:30 a.m. on December 23, 1993, but kept in a waiting room until 9:00 p.m., instead of being admitted to the labor and delivery room promptly upon arrival. She had a family history of pregnancy induced hypertension and was complaining of a headache, but the hospital ordered no lab work. She should have been evaluated every 3-4 hours, but essentially was ignored for almost 14 hours. At 9:00 p.m., with elevated blood pressure, she was transferred to labor and

delivery for induction. She showed consistently high blood pressure but drugs to correct this condition were not ordered until approximately 7:00 a.m. the next morning. She did not receive the drugs until 8:40 a.m., by which point her condition had deteriorated. A few hours later she was rushed to an emergency C-section, but the procedure was delayed and performed under clearly unfavorable conditions. After delivery of the baby, the doctors and nurses did not order the necessary deep vein thrombosis prophylaxis, which resulted in blood clots forming in the decedent's lungs, and the onset of pulmonary edema, a complication of severe preeclampsia accompanied by the lungs filling with fluid. She regained consciousness briefly following her C-section, but her condition deteriorated to where she was placed on a ventilator and transferred to the intensive care unit. Doctors at the hospital again failed to order appropriate measures to help her. She developed Adult Respiratory Distress Syndrome and died on January 4, 1994, at age 26.

Decedent's estate filed the lawsuit against numerous individuals associated with her care and alleged corporate negligence against the hospital. Prior to trial, all defendants had settled except the hospital. **Whittington**, 768 A.2d at 1147. The court allowed the jury to hear evidence relating to her entire course of care, so that it could properly apportion responsibility among the hospital and other defendants. **Id**. After an eight-day trial, the jury awarded $1,100,000 to the estate, $200,000 for wrongful death and $900,000 for the survivor action. **Id**. The jury apportioned liability to the hospital as (15%) directly for corporate liability and (10%) for vicarious liability, and the

court molded the verdict accordingly. *Id*. The hospital filed a post-trial motion requesting JNOV or a reduction of its pro rata share of damages based on corporate liability. Essentially, it claimed the estate failed to make out a *prima facie* case of corporate negligence.

As a matter of law, we determined that the estate established that the hospital failed to ensure the decedent's safety and wellbeing at the hospital, thus breaching the standard of care owed to decedent. *Id.* at 1149. Specifically, we concluded that the hospital "failed in its duty to oversee all persons who practice medicine within its walls as to patient care, the third duty enumerated in *Thompson*." *Id.*

To establish corporate negligence, the estate was required to introduce evidence of the following:

1. The hospital acted in deviation of the standard of care;

2. The hospital had actual or constructive notice of the defects of procedures which caused the harm; and

3. The conduct was a substantial factor in bringing about the harm.

*Id*. (citing *Welsh, supra*). Further, unless the hospital's negligence was obvious, expert testimony was required to establish the first and third prongs of the above test. *Id*.

The estate's expert opined that the hospital deviated from the standard of care at the time the decedent was admitted:

> At the time she was admitted on 12/22/93, she was again fulminate toxemia. **She needed to be admitted, stabilized, immediately induced or a C-section, if induction was not**

- 12 -

> **possible, to get the baby out and to stop the process of preeclampsia. And that was not done.**

*Id*. at 1151. (emphasis in original)

The expert further opined that this deviation was a substantial factor in bringing about the decedent's death:

> Again, had they started the induction at that time and had they seen there was a failure in progress, in all probability, the fulminate aspect of the toxemia would not have occurred so rapidly.

*Id*.

Additionally, the expert testified about another deviation from the standard of care when the hospital ignored the decedent's prior records and sent her to a waiting area.

> All of the information [showing she needed induction immediately] was readily available and mandatory to be reviewed in a patient who presents at 350 pounds at 42 weeks for an induction. **None of that was done. And that is a deviation, number one, by anyone and everyone that had to do with the patient from the time of 7:30 on**.

*Id*. (emphasis in original). The failure to check on her every 3-4 hours also deviated from the standard of care. *Id*.

Finally, the expert opined that the hospital failed in its post-operative care by failing to provide the minimum prophylaxis to prevent deep vein thrombosis. "And that is putting on the antithrombin and the doctors to initiate Heparin therapy. And this was not done." *Id*. at 1152. The failure to use these safeguards was a cause of death. *Id*.

A second expert, independently and in conjunction with the first expert, confirmed the opinion that the hospital deviated from the standard of care and that these deviations were a substantial cause of the decedent's death. *Id*. at 1153.

Having found that the estate met the first and third prongs of the *prima facie* case of corporate negligence through expert testimony, we proceeded to the final prong under **Thompson**, whether the hospital had actual or constructive notice of the defects or procedures creating the injury. *Id*. We concluded that the hospital may properly be charged with constructive notice since it should have known about the decedent's condition. *Id*. at 1154. As we discussed, "in **Welsh**, our supreme court found that a *prima facie* case of corporate negligence had been established where the plaintiff's expert opined that the hospital nurses should have known there was a problem but failed to act on that knowledge." *Id*. (citing **Welsh**, 698 A.2d at 584). As in **Welsh**, we found the hospital was also liable since it must have known what was going on but failed to act. *Id*. Further, we found that **constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision**. *Id.*

> Had [the hospital] undertaken adequate monitoring, it would have discovered that decedent had received and was continuing to receive medical treatment that was clearly deficient before and after her delivery. We are compelled to find constructive notice under these circumstances.

*Id*.

Since the estate made out a *prima facie* case of corporate negligence, we found the trial court correctly allowed the matter to go to the jury. Because the jury's verdict was consistent with the substantive evidence, we also found the trial court committed no error in denying the hospital's request for JNOV on this ground. *Id*.

In the instant case, Ms. Corey claims that she made out a *prima facie* case of corporate negligence because the hospital knew the condition of her husband when he arrived at the emergency room yet failed to give him the proper medical care. As in **Whittington**, she produced expert testimony to establish the first and third prongs of the *prima facie* case.

First, Dr. Paynter, an expert in the fields of emergency medicine and corporate responsibility, opined that the Hospital's emergency department "did not meet the standard of care." N.T., Trial part 2 at 35. He explained in great detail what was done and what should have been done regarding the hospital's treatment of Mr. Corey.

Prior to his arrival, Mr. Corey called 911. *Id*. The paramedics who responded to the call discovered that Mr. Corey "was very short of breath." They did a pulse oximetry test and discovered his hemoglobin was 62 percent saturated (normal is about 99 percent), which was a sign of "serious respiratory problems going on." *Id*. at 36-37. They gave him breathing treatments, and then they put him on a CPAP machine. *Id*. at 37. They also started him on a steroid drug to reduce inflammation in his lungs. *Id*.

- 15 -

They brought him to the hospital where the nurse recognized he was severely ill. *Id*. The hospital did tests and discovered he had pneumonia. *Id*. They placed him in a room and transferred him to a BiPAP machine.

According to Dr. Paynter, a patient who presents at the ER in this condition should have prompted the emergency department to test Mr. Corey's arterial blood gas to determine the level of carbon dioxide in his blood, by assessing the pH. As the doctor described:

> Anybody who arrives in a hospital with either CPAP or BiPAP right off the ambulance is required to have a test called an arterial blood gas. Now, what is an arterial blood gas? …It's taken from usually the radial artery in your wrist and it goes into your pulsing artery … and it takes blood that has just gone through your lungs and heart into the artery and it's a much better measure. It's the only real standard measure for the person's respiratory status because you can tell what's …going on in the blood that just went through the heart and lungs. How well it's been oxygenated. What the level of CO2 is, most important. And the pH. The pH is the acid level. If you're not breathing adequately, your blood becomes acid, acidotic is the term we use.

> Normally our acid level is 7.4. If it drops down to 7.1 you are on the verge of dying. If you go down to 7, many people can't sustain that. If you go down to 6.9, it's hard to reverse. The first level they did on him **after he coded** was in the 6.9 range.

*Id*. at 38-39. (emphasis added).

Dr. Paynter explained that the arterial blood gas test "is a guide to how to manage this person's respiratory condition." *Id*. at 39. If the test reveals that a patient is in so much respiratory distress that they might stop breathing, then "you want to intubate the patient **before** they have respiratory arrest.

Once they stop breathing, you're behind the eight ball.  It's hard to reverse everything." ***Id***. (emphasis added).

Dr. Paynter criticized the Hospital for not following this standard of care with Mr. Corey:

> So you do the blood test.  If they are in respiratory distress, you sedate them and you put them on a ventilator.  That's what should have happened here. Instead, they waited. They waited.  They tried to do other modalities.  His respiratory rate this whole time was in the 40s [while the normal respiratory rate is 15 to 20].

***Id***.

This was a concern because Mr. Corey was breathing twice the rate of a normal person, which meant his respiratory muscles were getting exhausted, he could just stop breathing from the exhaustion.  ***Id***. at 39-40.  The work of breathing can overcome the person; "that's why you do an elected intubation."

***Id***. at 40.

> The other problem is that if the $CO_2$ level is high and creating an acid situation, it's very dangerous for the body.  In addition, [Mr. Corey] had infection which also adds to the acid level as well….
>
> But you want to correct the respiratory acid by putting the tube in and ventilating the patient.  Now, you can try and do it on the BiPAP, but **you have to do a blood gas test** to see that it's at 65 or 70, and it's supposed to be 40. **And you can repeat the test in an hour or even a half an hour and see if it is getting better.  If it's not getting better, then you have [to] electively intubate.**

***Id.***

As Dr. Paynter opined, the hospital failed to do this test and intubate Mr. Corey in a timely fashion:

> They didn't do any of that. They just placed [Mr. Corey] in a room and he got progressively worse to the point where he reached the point of in extremis, is the term we use in medicine, and that's

- 17 -

the time before you die. And he ripped his mask off and he stopped breathing and his blood pressure, his pulse all stopped.

*Id*. at 40-41.

Dr. Paynter maintained that the standard of care was breached here because the Hospital failed to take standard approaches to help Mr. Corey who was in respiratory distress. "He was at the hospital for almost two hours before he stopped breathing. They needed to intervene. The simple way to intervene is an arterial blood gas, measure the abnormality, make a decision to intubate. That should have been done in this case." [4] *Id*. at 50.

The trial court assumed that Dr. Paynter's references to "they" meant Dr. Perry or Nurse Bond, and not the hospital itself. Trial Court Opinion at 6. Viewing this testimony in the light most favorable to the plaintiff, however, the trial court should have let the jury decide who Dr. Paynter meant by "they;" who he meant by "they" was a question of fact. As he was qualified in the areas of emergency room medicine and corporate responsibility, a reasonable person could have believed that "they" was the Hospital itself.

Mrs. Corey argues that Dr. Paynter's testimony is analogous to that provided in ***Whittington*** to establish a hospital's deviation from the standard

---

[4] Dr. Paynter further opined that the Hospital was not monitoring Mr. Corey closely and that "when he did finally peter out and stopped breathing on his own, they were not there to help him." N.T., Trial part 2, p. 51. He noted that Mr. Corey was unobserved for a period of 12 minutes after he took off his BiPAP mask before he coded. *Id*. at 46-47. More than likely that was the time that the significant amount of anoxic brain injury occurred. If he had been intubated prior to that, he would have been protected. He would have been on a ventilator [with alarms]. But none of that was in place. *Id*. at 47. This is a second reason why the Hospital deviated from the standard of care.

of care. Appellants Brief at 45. ("The decision in **Whittington** represents a template by which Dr. Paynter's testimony can be measured.") We agree. Mrs. Corey offered sufficient evidence of the first prong of corporate negligence.

Dr. Paynter also testified about the third prong of the corporate negligence test, that the hospital's conduct was a substantial factor in bringing about the harm. Dr. Paynter reviewed Mr. Corey's autopsy report, which indicated the factual cause of death was "lack of oxygen to the brain." **Id**. at 35. He opined that if Mr. Corey had been timely tested and intubated, he would have had a substantially greater chance at living:

> He should have survived this episode of bad pneumonia and he would have – you know, the ventilator would have gotten him through it. And he would have been – his respiratory acidosis would have been corrected. He would have received antibiotics. He would have probably had to stay on the ventilator for a day or two. And then he should have come off it and he should have been okay.

**Id**. at 45. This testimony is enough to support the causation prong.[5]

---

[5] This testimony is what distinguishes this case from **Edwards v. Brandywine Hosp**., 652 A.2d 1382, 1384 (Pa. Super. 1995). There, the trial court took notice of a Health Department regulation requiring catheter site changing every 48 hours to avoid infection, and ruled that the hospital's admitted failure to move the heparin lock (which allows multiple intravenous fluids to be introduced at the same site) on the patient's wrist for at least three days constituted negligence *per se*. After this ruling, Mr. Edwards' treating physicians settled, leaving only the hospital as a defendant. At the close of Mr. Edwards' case, the trial court granted the hospital's motion for a directed verdict. The court held that while the negligence *per se* ruling established the hospital's breach of a duty of care, Mr. Edwards could not prove causation as a matter of law. The negligence only occurred because
*(Footnote Continued Next Page)*

Finally, Ms. Corey maintains that under this theory of corporate negligence, the second prong of actual or constructive notice should be imposed upon the Hospital. She relies on our precedent where we have held that "constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision." Appellant's Brief at 44 (citing *Brodowski v. Ryave*, 885 A.2d 1045, 1057 (Pa. Super. 2005)).

The trial court found that Mrs. Corey "provided no evidence that [the hospital] as an institution had actual or constructive notice of such negligence during the approximately 12 hours that Mr. Corey was treated there." T.C.O. at 6. Lack of notice is why the court concluded that she did not establish the third duty under *Thompson*. *Id*. However, because case law imposes constructive notice on a hospital in situations like this, we conclude the trial court erred when it found no notice in this case. With the element of constructive notice met, Mrs. Corey did establish the second prong of corporate negligence on the part of the hospital.

In sum, Mrs. Corey established a *prima facie* case of corporate negligence, that the hospital violated its duty to oversee all persons who practice medicine within its walls as to patient care, when it failed to

---

the lock was left on for more than two days, but Mr. Edwards could offer no proof that the staph infection he got entered his body sometime after the second day. As such he could not link the negligent conduct with his injuries. Here, the trial court's reliance on *Edwards* is misplaced because Dr. Paynter offered testimony that the Hospital's conduct was a substantial factor in bringing about the harm to Mr. Corey. Unlike the plaintiff in *Edwards*, Mrs. Corey produced evidence of causation.

administer the appropriate testing of her husband upon his arrival at the emergency room. She provided the requisite expert testimony to establish the first and third prongs of the test, and constructive notice should be imposed upon the Hospital under these facts to establish the second prong. With all three prongs met, we conclude the corporate negligence claim should have been submitted to the jury; the trial court erred by granting a nonsuit on this claim. As such, we reverse and remand for a new trial against the Hospital.[6]

---

[6] Based on our resolution of Mrs. Corey's first appellate issue, we need not address her remaining issues. We deny as moot, PPS's application to dismiss Mrs. Corey's second issue for failure to preserve it below. We observe that, because the jury found no negligence on the part of Nurse Bond or PPS, there would be no vicarious liability of the Hospital in this case, even if the Hospital was on the verdict slip for question No.1. The only remaining issue is whether the Hospital bears any responsibility under the theory of corporate negligence.

Judgment in favor of the Hospital vacated. Denial of Mrs. Corey's motion for post-trial relief reversed; case remanded for further proceedings consistent with this Memorandum.

Jurisdiction relinquished.

President Judge Jack Panella joins this Memorandum.

Judge King notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/20/2023