652 A.2d 1382

Charles EDWARDS, Appellant,

v.

BRANDYWINE HOSPITAL and Aimee M. Waters, Michael J. Margolies, and Richard Price Margolies, Personal Representatives of the Estate of M. Price Margolies, M.D. and M. Price Margolies Associates, Appellees,

Charles EDWARDS, Appellee,

v.

BRANDYWINE HOSPITAL and Aimee M. Waters, Michael J. Margolies, and Richard Price Margolies, Personal Representatives of the Estate of M. Price Margolies, M.D. and M. Price Margolies Associates,

Appeal of Brandywine Hospital.

Superior Court of Pennsylvania.

Argued Dec. 14, 1994.

Filed Jan. 25, 1995.

674

Roger E. Legg, Coatesville, for Charles Edwards.

R. Bruce Morrison, Philadelphia, for Brandywine Hosp.

Before McEWEN, OLSZEWSKI and JOHNSON, JJ.

OLSZEWSKI, Judge:

In 1986, Charles Edwards was a 69–year–old retired steel worker with an artificial hip. He arrived at the Brandywine Hospital emergency room on August 25, complaining of hip pain. The hospital admitted him, and the nursing staff installed a heparin lock on his left hand. A heparin lock is a device which allows multiple intravenous fluids to be introduced at a common point.

Mr. Edwards stayed at the hospital for five days. The heparin lock was left in place for either three or four days, in apparent violation of standards promulgated by the Pennsylvania Department of Health.[1] The day after his discharge

---

1. 28 Pa.Code § 146.1. The regulation requires hospitals to develop written standards regarding such antiseptic practices as changing intravenous catheter sites. The regulation states that these standards should comply with those described in the American Hospital Association's publication entitled *Infection Control in the Hospital* (1979), which recommends that intravenous catheter sites be changed every 48 hours in order to avoid infection. The longer the catheter remains in the same site, the greater the risk of infection. *Id.* at 166; R.R. 222a. Mr.

from the hospital, Mr. Edwards noticed a red spot on the back of his hand where the heparin lock had been. He returned to the hospital that day for physical therapy, and his therapist referred him to the emergency room. An ER physician checked Mr. Edwards' hand, took a sample of pus for analysis, and sent him home with a prescription for oral antibiotics. The lab results came back the next day showing a staphylococcus aureus (staph) infection. The ER physician placed the lab results and diagnosis in Mr. Edwards' chart, as required by hospital rules.

A few days later, Mr. Edwards returned to the hospital with leg pains. Somehow, his treating physicians did not notice the recent diagnosis of a staph infection in his chart. After a week, Mr. Edwards' treating physicians ordered a second lab test, which again showed the presence of a staph infection. Now Mr. Edwards' doctors put him on intravenous antibiotics. By the end of September Mr. Edwards' doctors believed they had wiped out the infection, and discharged him. He was back again a week later with pain and a fever. This time his doctors suspected that the obviously-not-yet-defeated staph infection had spread to Mr. Edwards' artificial hip.

Mr. Edwards stayed in the hospital for a month. He claimed he was discharged not for medical reasons, but because his Medicare hospitalization coverage was about to expire. He endured more treatment and hospitalizations over the next two years, until his doctors decided to remove his artificial hip and wipe out the staph infection with massive doses of antibiotics. Without his hip prosthesis, Mr. Edwards now needs crutches or a walker to get around.

Mr. Edwards sued the hospital and the doctors who treated him there for professional negligence. The trial court took notice of the Health Department regulation regarding catheter site changing, and ruled that the hospital's admitted failure to move the heparin lock for at least three days constituted negligence per se. After this ruling, Mr. Edwards' treating physicians settled, leaving only the hospital as a defendant.

Edwards testified that the heparin lock stayed in his hand for four days; his hospital records indicate that it was changed after three days.

At the close of Mr. Edwards' case, the trial court granted the hospital's motion for a directed verdict. The court held that while the negligence per se ruling established the hospital's breach of a duty of care, Mr. Edwards could not prove causation as a matter of law. The court also held that the hospital could not be found liable under the theory of corporate negligence adopted in *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). Mr. Edwards has appealed these rulings, and the hospital has taken this opportunity to cross-appeal the trial court's negligence per se ruling, in the event that we should grant a new trial.

■ In reviewing a trial court's decision to direct a verdict in favor of a defendant, we must view the evidence presented in the light most favorable to plaintiff and determine whether plaintiff failed to prove his case as a matter of law. *Lattanze v. Silvestrini,* 302 Pa.Super. 217, 448 A.2d 605 (1982). Because we disagree with the trial court's analysis that Mr. Edwards failed to establish causation, we must reverse and remand for a new trial.

Before launching into a discussion of causation and the other questions presented, it would be helpful to review the theory of this case, and how it unfolded at trial. Mr. Edwards claimed that his doctors and the hospital made à number of mistakes in treating him which led to his severe bacterial infection and the removal of his hip prosthesis. The big mistake was allowing him to develop a staph infection. Mr. Edwards sought to prove that the hospital was negligent for leaving the heparin lock in his hand for too long, which allowed the staph infection to develop. Mr. Edwards also sought to prove that a series of lesser mistakes exacerbated the initial infection, leading to the ultimate result of his hip loss: the ER doctor should have prescribed intravenous antibiotics, not oral antibiotics; the diagnosis of staph infection should have been noted by his treating physicians immediately upon his return to the hospital; his treating physicians should have consulted with an infectious disease expert early on; and the hospital should not have discharged him so soon, without a

prescription for more antibiotics, and without adequate follow up.

The trial court took note of the Department of Health regulation which referred to a rule that intravenous catheter sites should be changed every 48 hours. The hospital was prepared to argue that this standard was never mandatory, and by 1986 was superseded by a 72–hour standard promulgated by the Centers for Disease Control. The trial court held that the Department of Health regulation, even if outdated and superseded, was still the applicable standard. It ruled that the hospital was negligent per se in leaving the heparin lock in the same place for over 48 hours. S.R.R. at 325a–29a.

The trial court then held that while duty and breach were established as a matter of law, Mr. Edwards had failed to prove causation as a matter of law, and that none of the other alleged mistakes by the hospital could constitute negligence. The court therefore directed a verdict in favor of the hospital.

## I.

We begin with the causation question. In order to focus solely on causation, we will presume arguendo that duty and breach were properly established; that is, that the trial court's negligence per se ruling was correct. Thus, we accept as a premise that the hospital left the heparin lock in Mr. Edwards' hand longer than it should have, and that this oversight constituted a breach of the hospital's duty of reasonable care. Now we must determine whether the trial court correctly concluded that this breach of duty could not, as a matter of law, have caused the staph infection.

Mr. Edwards presented an array of evidence that leaving the heparin lock in his hand for too long caused the staph infection. He had the Department of Health regulation itself, which referred to the American Hospital Association's publication, *Infection Control in the Hospital* (1979). In describing why intravenous catheters should be moved every 48 hours, the publication states: "The frequency of sepsis resulting from intravenous fluid therapy is directly related to the length of

time a catheter is left in place." R.R. 223a. We cannot understand how the trial court could admit this regulation as irrebuttable evidence of a 48–hour standard for moving catheter sites, but at the same time ignore the reason why catheters need to be moved so frequently: the longer a catheter stays in the same place, the greater the likelihood of infection. The standard gives no other reason for moving the site, but states quite plainly that leaving the catheter in one spot for too long causes infection. How long is too long? More than 48 hours. It makes no sense to recognize a legal duty but then ignore the sole reason for imposing that duty.

Mr. Edwards offered more than just the standard. His expert on infectious diseases testified to this same causal relationship. R.R. 155a; appellant's brief at 18. Mr. Edwards also introduced into evidence the discharge report from his second hospitalization. This report noted that Mr. Edwards' staph infection was thought to be secondary to an abscess at the heparin lock site, which was evident following his first discharge from the hospital. R.R. 273a.

Despite all this evidence, the trial court held that the issue of causation could not even go to the jury, but had to be decided against Mr. Edwards as a matter of law. The court reasoned that to establish legal causation, Mr. Edwards had to prove that staphylococcus bacteria entered his body at the heparin lock site at least 48 hours after the lock was installed, because it was only after 48 hours that the hospital became negligent in not moving the catheter. Trial court opinion 5/5/94 at 6–8. The court held that "[t]here is simply no evidence as to when this organism entered Mr. Edwards even if I assume that it did enter through the heparin lock site.... The jury would have had to speculate as to when the organism entered the body and this I would not permit." *Id.* at 7, 8.

Causation is always a difficult concept. In cases involving interactions of what physicists would call macroscopic, rigid bodies, we can think of causation as a chain of events, one physically entailing the next—a sort of Rube Goldberg contraption at work. But in many medical malpractice cases, we find ourselves dealing with organic reactions at a microscopic

level. The kind of causation evidence the trial court expects cannot be produced. No witness could possibly testify that she saw a staphylococcus aureas bacterium crawl into Mr. Edwards' hand through the heparin lock site on his third day in the hospital, and then multiply into the infection which spread to his artificial hip. Yet the trial court's ruling implied that such showing was necessary to get to the jury.

Fortunately, we do not apply such a standard in medical malpractice cases. Our Supreme Court outlined the proper approach in the seminal case of *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978):

Once a plaintiff has introduced evidence that a defendant's negligent act or omission **increased the risk of harm** to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Id.* at 269, 392 A.2d at 1286 (emphasis added).

Applying this standard, we see that the causation issue should have gone to the jury. The trial court established the first prong, a breach of a duty, with its negligence per se ruling. Mr. Edwards then introduced evidence that leaving a catheter in the same place for too long increases the risk of infection. He also put on evidence that an infection in fact resulted from this precise negligent act and increased risk. That is all he can do to establish causation, and all *Hamil* requires to make a legally cognizable claim. A jury might choose to reject it, or they might find some superseding cause, but we must recognize that the claim is sound enough to go to the jury.

## II.

Mr. Edwards next claims that the trial court erred in directing a verdict against him in his other allegations of negligence which contributed to his staph infection and hip loss. Specifically, Mr. Edwards claims that he presented enough evidence of negligence to establish a jury question

under the theory of corporate liability recently set forth in *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). Since this Court has had little opportunity to interpret *Thompson,* we will take a moment to examine this case.

To understand what this theory of corporate liability means, we must take a careful look at *Thompson's* discussion of the evolution of hospitals' tort liability. Hospitals once enjoyed complete tort immunity as charitable institutions. As hospitals evolved into sophisticated corporate entities which expected fees for services, their tort immunity receded. Courts first recognized that hospitals could be held liable for their employees' negligence under respondeat superior. Later, liability was extended for non-employees who acted as a hospital's ostensible agents. *Id.* at 336–40, 591 A.2d at 706–07.

*Thompson* recognized that hospitals are more than mere conduits through which medical professionals are brought into contact with patients. Rather, a hospital owes some non-delegable duties directly to its patients, and can be found liable for a breach of these duties independently of the negligence of its employees or ostensible agents. Hospitals have:

(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

(2) a duty to select and retain only competent physicians;

(3) a duty to oversee all persons who practice medicine within its walls as to patient care; and

(4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for its patients.

*Id.* at 339–40, 591 A.2d at 707 (citations omitted).

We agree with the trial court that on the surface, these enumerated duties might appear broad and somewhat nebulous.[2] But when contrasted with the well-established theories

---

**2.** Indeed, the trial court cited the *Thompson* dissent with approval, and opined that these nebulous duties were "nothing more than job security for the plaintiff's bar which will further clog the appellate and trial courts while we try to divine Justice Zappala's intent." Trial court opinion, 5/5/94 at 14, 16. While we can appreciate the trial court's difficulties with *Thompson,* we must keep in mind that lower courts are

of vicarious liability, we can better discern their outlines. The *Thompson* theory of corporate liability will not be triggered every time something goes wrong in a hospital which harms a patient. Acts of malpractice occur at the finest hospitals, and these hospitals are subject to liability under theories of respondeat superior or ostensible agency. To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, *Thompson* requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard. This requires evidence that the hospital knew or should have known about the breach of duty that is harming its patients. *Id.* at 340, 591 A.2d at 708.

Thus, a hospital is not directly liable under *Thompson* just because one of its employees or agents makes a mistake which constitutes malpractice. Just as regular negligence is measured by a reasonable person standard, a hospital's corporate negligence will be measured against what a reasonable hospital under similar circumstances should have done. *Thompson* contemplates a kind of systemic negligence, such as where a hospital knows that one of its staff physicians is incompetent but lets that physician practice medicine anyway; or where a hospital should realize that its patients are routinely getting infected because the nursing staff is leaving catheters in the same spot for too long, yet the hospital fails to formulate, adopt or enforce any rule about moving catheters. *Thompson* does not propound a theory of strict liability, a theory that Mr. Edwards' brief argues and the trial court found so disturbing. Though broadly defined, *Thompson* liability is still fault based. *Cf. Walls v. Hazleton State General Hospital*, 157 Pa.Cmwlth. 170, 175, 629 A.2d 232, 235 (1993) (expert testimony that defendant doctor was negligent did not show that defendant hospital was also negligent under *Thompson*); *Cafazzo v. Central Medical*, 430 Pa.Super. 480, 484, 635 A.2d 151, 153 (1993) (*Thompson* presented a question of negligence, not strict liability).

bound to try to figure out what the duties mean and apply them, rather than dismiss them or distinguish them away.

Turning to Mr. Edwards' specific claims, we see that most of them can amount to no more than individual acts of negligence for which the hospital, as a corporate entity, could not be held directly liable.[3]

■ Mr. Edwards' first *Thompson* claim is that the ER doctor who examined his hand should have immediately put him on intravenous antibiotics instead of just prescribing oral antibiotics. The trial court held that such a course of treatment "would probably be overkill in the majority of cases" and that the hospital in any event could not be charged with actual or constructive notice of such an error. Trial court opinion at 16, 17. We need not express any opinion on the quality of the ER doctor's treatment of Mr. Edwards. We simply agree with the trial court that even if the ER doctor was negligent, Mr. Edwards introduced no evidence that the hospital as an entity knew or should have known about this mistake, or that a reasonable hospital would have intercepted and corrected it.

■ The second *Thompson* claim is that the hospital's laboratory notification procedure was deficient, because Mr. Edwards' personal physicians treated him for a week during his second hospitalization without noticing the lab report which indicated a staph infection. Again, Mr. Edwards may have a claim against his treating physicians for not reading his chart when he came in the second time. But the hospital did have a notification procedure in place: the ER doctor put the lab report in Mr. Edwards' chart, where it should have been noticed. Mr. Edwards has not provided any evidence that a reasonable hospital would require its ER staff or lab technicians to personally notify every patient's treating physician of every test result, even when the patient has been discharged.

■ Mr. Edwards next claims that the hospital was deficient for adopting a rule allowing its physicians complete discretion in deciding when to consult with experts. R.R. 246a–47a. If Mr. Edwards' treating physician should have

---

**3.** Mr. Edwards does not argue on appeal that any of these claims should have gone to the jury on theories of respondeat superior or ostensible agency, so we express no opinion on these questions.

consulted with an infectious disease expert earlier in his case, then his treating physician may have been negligent. But to make out a viable *Thompson* claim, Mr. Edwards would have to prove that the hospital knew or should have known that his doctors were not seeking expert advice when they should have.

■ The discharge claim is similar. Mr. Edwards may have been able to prove that his physicians discharged him prematurely. He may have been able to convince a jury that he was discharged because his medicare hospitalization coverage was exhausted. But the decision to discharge Mr. Edwards was made by a single physician, not the hospital as a corporate entity. R.R. 271a. Thus, the hospital cannot be held liable for a discharge error absent proof that it knew that Mr. Edwards' discharge was premature, or that its physicians were regularly making bad discharge decisions.

■ The only properly developed *Thompson* claim concerned the hospital's rule for moving intravenous catheters. Mr. Edwards introduced evidence that a 48–hour rule was appropriate, but the hospital had adopted a different rule allowing catheters to be left in place for as long as 72 hours. R.R. 241a. This situation implicates not just an individual mistake, but the hospital's "duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for its patients." *Thompson, supra* at 339–40, 591 A.2d at 707. If Mr. Edwards could prove that the 72–hour rule was inadequate, that the hospital should have known better, and that following this rule caused him harm, then he has made out a proper *Thompson* claim. The trial court apparently acknowledged that its negligence per se ruling (recognizing the 48–hour standard as a Department of Health regulation) constituted negligence on the part of the hospital itself. The trial court then fell back on its causation ruling to dismiss this claim. Opinion, 5/5/94 at 20–21.

This particular claim helps to illustrate the difference between individual negligence and corporate negligence. If Mr. Edwards' nurse should have known to change the heparin lock

site after 48 hours but failed to, then Mr. Edwards could sue the hospital for this individual's negligent act under respondeat superior. If the hospital itself (through its official committee on infection control) adopts a substandard rule for changing intravenous catheter sites, then it may be liable in its corporate capacity. A nurse following hospital rules cannot be faulted, but the hospital can if it knew or should have known that its catheter rule was inadequate. Our above causation analysis applies to both theories of liability. Thus, we must hold that the trial court erred in directing a verdict on this claim.

### III.

■ This finally brings us to the issue which the hospital has prudently raised in its cross-appeal: did the trial court err in holding that leaving the heparin lock in the same spot for over 48 hours constituted negligence per se?

The trial court arrived at this ruling by examining a Pennsylvania Department of Health regulation:

(a) A multidisciplinary committee made up of representatives of the medical staff, the administration, the microbiology laboratory, and the nursing staff **shall** establish effective measures for the control and prevention of infections.

(b) The multidisciplinary committee described in subsection (a) **shall** do the following:

(1) Develop written standards for hospital sanitation and medical asepsis. Copies of the standards **shall** be made available to all appropriate personnel. Adequate standards **should** comply with those described in *Infection Control in the Hospital,* published by the American Hospital Association, Chicago, Illinois.

28 Pa.Code § 146.1 (emphasis added); R.R. 222a. Page 166 of *Infection Control* states that intravenous catheter sets should be changed and moved to a different site every 48 hours. R.R. 222a–23a.

The hospital was prepared to argue at trial that *Infection Control in the Hospital* (1979) was an outdated publication,

and that the 48–hour standard had been superseded by a 72–hour standard promulgated by the Centers for Disease Control. The trial court ruled that even if the 48–hour standard was outdated, the Pennsylvania Department of Health expressly adopted it by reference in its regulation, so the hospital had to follow the 48–hour rule until the Department got around to changing it. S.R.R. at 325a–29a.

We see no need to determine whether the 48–hour standard was current or outdated, because the regulation only referenced the standard, and did not require its adoption. The regulation merely states that whatever standards a hospital's infection committee chooses to adopt **should** be in line with *Infection Control.* The regulation did not require Brandywine Hospital to follow in lock step with the 48–hour rule, so its decision to adopt a 72–hour rule is not necessarily negligent. We do not express any opinion about what the correct standard should be, or whether the hospital's actions were negligent. We merely hold that the hospital's failure to move Mr. Edwards' heparin lock after 48 hours did not constitute negligence **per se.**

Mr. Edwards attempts to characterize the 48–hour rule as mandatory by arguing that the word "should" is the past tense of word "shall," and since by principles of statutory construction the past tense includes the future tense, " 'should' equals 'shall'." Appellant's reply brief at 8–9. This argument is grammatically unpersuasive. In statutory or regulatory language, "shall" and "should" are modal auxiliaries which are used in conjunction with other verbs to express imperative and aspirational conditions, respectively. *See, e.g.* Rules of Professional Conduct, Scope, 42 Pa.C.S.A. The regulation's alternating use of "shall" and "should" clearly show the Health Department's appreciation of the difference between the mandatory and the aspirational.

To sum up, we hold: the trial court improperly directed a verdict against Mr. Edwards for failing to establish causation; the trial court correctly directed verdicts on most of Mr. Edwards' *Thompson* claims; however, the claim regarding the hospital's 72–hour rule properly implicates the hospital's cor-

688

porate liability under *Thompson* and should not have been dismissed, and; the trial court's negligence per se ruling was in error. We therefore reverse and remand for a new trial.

Order reversed and remanded for a new trial. Jurisdiction relinquished.