# Collins v. Gettysburg Hospital

C.P. of Adams County, no. 95-S-507.

*Joseph L. Messa Jr.,* for plaintiff.
*Evan Black,* for defendant Gettysburg Hospital.
*Michael M. Badowski,* for defendant Shah.

KUHN, *J.,* August 27, 2001—Before this court is a motion for summary judgment filed by Gettysburg Hospital. Based upon the following analysis, the court grants the motion.

This litigation followed the untimely death of Johanna Collins on July 22, 1993, of complications from hepatitis B. The action commenced June 5, 1995. Eventually, an amended complaint was filed on October 30, 1996, which set forth a claim for wrongful death (Count I) and

a survival action (Count II) against all defendants, a claim for vicarious liability/agency (Count III) and corporate liability (Count IV) against Gettysburg Hospital, and a claim of negligence (Count V) against Satish A. Shah M.D.

Our Superior Court has recently set forth the standard for summary judgment as follows:

"Initially, we note that our standard for reviewing a grant of summary judgment is well settled.

"[S]ummary judgment is properly entered where the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits demonstrate that no genuine, triable issue of fact exists and that the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035(b); . . . . The court must examine the record in the light most favorable to the non-moving party and resolve all doubts against the moving party. . . . Moreover, the burden is on the moving party to prove that no genuine issue of material fact exists. *Accu-Weather v. Prospect Communications, supra* (citing *Overly v. Kass,* 382 Pa. Super. 108, 111, 554 A.2d 970, 972 (1989)) . . . ." *Long v. Yingling,* 700 A.2d 508, 512 (Pa. Super. 1997), *alloc. denied,* 555 Pa. 731, 725 A.2d 182 (1998). (citations omitted)

Viewing the record in a light most favorable to plaintiff, the following background is relevant. Decedent Johanna Collins was born March 14, 1955. On June 4, 1992, at age 37, she had a mammogram, which revealed a mass on her left breast not seen in a 1987 study. There was a family history of breast cancer. A biopsy performed by Dr. Frederick Lorenzo on December 22, 1992, indicated intraductal carcinoma. Lab tests done on decedent

six days prior to the biopsy revealed no indication of the presence of hepatitis B. On three occasions in early 1993 (January 25, February 2, February 7) decedent donated blood for use during surgery for a radical left mastectomy to be performed at Georgetown University Hospital by Dr. Marie Pennanen on February 22, 1993. Each unit tested negative for hepatitis B. Two units of that blood were ultimately used during the surgery.

On or about March 26, 1993, decedent referred herself to Dr. Shah and came under his care for chemotherapy treatment. He recommended Cytoxan, Adriamycin, and 5FU (CAF) chemotherapy. On April 3, 1993, decedent had normal liver function studies done which indicated the absence of hepatitis. On April 7, 1993, Dr. Henry Maxwell inserted a Groshong port into decedent at the Gettysburg Hospital. The port was to be used for administering chemotherapy. In preparation for this procedure, there was some preoperative blood work done which revealed that decedent's liver enzymes were normal. Chemotherapy treatments were administered at Dr. Shah's office on April 12, May 3, May 24 and June 14.

On April 19, 1993, decedent complained to Dr. Shah of nausea, mild fever and chills. She was advised that she could be suffering from the flu or reacting to the chemotherapy. On June 14, decedent complained to Dr. Shah of achiness, tiredness, cough, and dry mucus membranes. A liver profile was performed and the results were received by Dr. Shah two days later. The profile revealed elevated liver functions, specifically elevated levels of aminotransferases to greater than 10 times the normal values. Nevertheless, on June 18, Dr. Shah wrote to Dr. Lorenzo that "Overall, the patient is doing very well . . . ." He failed to mention decedent's symptoms or the abnor-

mal liver blood tests. On June 22, Dr. Shah gave decedent Neupogen. On June 23, decedent was complaining to Dr. Shah of lethargy, congestion, sneezing and tightness in her chest and throat. The following day, she returned to Dr. Shah with the same complaints.

On June 24, 1993, Dr. Shah admitted decedent to the Gettysburg Hospital. A CT scan revealed no evidence of metastatic disease to her liver. Dr. Shah requested Dr. Rajesh Bajaj to see decedent as a gastroenterology and hepatology consultant. Dr. Bajaj first saw decedent on June 25, and the following day he diagnosed her with acute hepatitis B. She remained in the hospital until June 28, when she was discharged by either Dr. Shah, Dr. Bajaj, or both of them.

On June 30, 1993, decedent appeared at the Gettysburg Hospital emergency room confused, disoriented, incoherent and jaundiced. The following day she was transferred to Georgetown University Hospital where she was diagnosed with fulmite hepatic failure and gastrointestinal bleeding secondary to acute hepatitis B. It was determined that she needed a liver transplant.

On July 6, 1993, decedent was transferred to University of Pittsburgh Presbyterian Hospital in critical condition because of hepatic failure and hepatic coma. A liver biopsy revealed submassive necrosis of the liver. She died 17 days later before a transplant could be accomplished. The cause of death was massive hepatic necrosis complicated by acute hemorrhagic pancreatitis, renal failure and sepsis from acute hepatitis B.

Plaintiff has produced the report of several experts. Briefly, these reports are as follows:

(1) Dr. Donna Glover issued a seven-page report dated August 3, 1998. She indicated that hepatitis B virus (HBV) is usually observed 29-43 days after parenteral exposure and 67-82 days after oral exposure. She also noted that "immunosuppressive therapy may increase the risk of hepatitis, enhance the development of the carrier state, and reactivate HBV infections in asymptomatic chronic carriers." She opines that by June 14, 1993, when decedent was taking longer to recover and with abnormal liver function studies that Dr. Shah should have realized decedent was experiencing severe toxicity from chemotherapy and that she would require Neupogen. Dr. Glover contends that Dr. Shah's delay in providing decedent with Neupogen until June 22 "was a deviation in standard medical practice" and caused decedent "to have severe immunosuppression and neutropenia which allowed her hepatitis progress [sic] to liver failure."

Dr. Glover also reported that on June 25, 1993, Dr. Shah gave decedent Tylenol for liver pain. This, according to Dr. Glover, "was a deviation in standard medical practice" because Tylenol is toxic to the liver. Furthermore, because of decedent's worsening liver functions, Dr. Glover believes that she should not have been discharged from Gettysburg Hospital on June 28, 1993.

(2) Dr. Santiago J. Munoz, head of the division of hepatology and medical director of the liver transplant program at the Albert Einstein Medical Center in Philadelphia, Pennsylvania, issued a three-page report dated September 29, 1998, and supplemented February 6, 2001. He initially stated that "Exposure to this hepatitis virus (HBV) must have occurred within three months preceding the beginning of Mrs. Collins' symptoms. Exposure to HBV prior to April of 1993 would be considered very

unlikely to result in acute hepatitis B in June of 1993, since the incubation period of hepatitis B rarely exceeds three months. Furthermore, Mrs. Collins tested negative for the hepatitis B surface antigen in January of 1993." Subsequently, he clarified the incubation period to be between 30 and 180 days with the "vast majority" being in the 30 to 90 day range. Because decedent was being treated with immunosuppressant drugs, it was "likely" that the incubation period for her was shorter. He opined that because decedent had no other risk factors for the acquisition of HBV other than the intravenous chemotherapy injections in Dr. Shah's office and the insertion of the port at the Gettysburg Hospital during the incubation period that these "constitute the most likely sources" of decedent's hepatitis infection.

In addition, Dr. Munoz opined that the delay in diagnosis of decedent's hepatitis by Dr. Shah, especially in consideration of the elevated liver blood tests in a patient undergoing chemotherapy was not "consistent with standard medical practice." He also concluded that discharging decedent from the hospital on June 28 in light of her condition was "very inappropriate." He concluded that, "the delay in diagnosis and the lack of awareness of the potentially fatal prognosis of acute hepatitis B in the setting of chemotherapy contributed to diminish the chances of survival of this patient."

(3) Dr. Bonnie Ashby, a clinical assistant professor of medicine at Thomas Jefferson University and infectious disease specialist, issued general opinions on September 30, 1998, in response to interrogatories and supplemented those opinions with a more detailed report dated April 27, 2000.

Dr. Ashby's initial report simply stated as follows:

"The following medical opinions are held to a reasonable degree of medical certainty.

"Johanna Collins was not a chronic carrier of hepatitis B.

"Johanna Collins' hepatitis B infection was acute.

"Johanna Collins' chemo-therapeutic treatments predisposed her to the onset of fulminant liver failure.

"Johanna Collins' hepatitis infection was acquired through the placement of the mediport catheter or the administration of the chemotherapy.

"There was a delay in the diagnosis and treatment of Johanna Collins' hepatitis.

"The delay in the diagnosis and treatment of Johanna Collins' hepatitis lessened her chances for survival."

In her April 2000 report she opined that decedent's death "due to hepatitis B was the direct result of deviations in the standard of medical care in the medical care given to her at some time between her breast biopsy in late 1992 and the spring of 1993, both at Gettysburg Hospital and the office of Dr. Shah." She noted that hepatitis B can be transmitted through a very small amount of contaminated fluid, a minor contamination of a needle, a medication, or a surgical instrument, and that possible sources include multidose medical vials, injections, and contact by technicians and medical personnel. She further stated that "this type of infection due to medical treatment does not occur in the absence of deviation from the standard care."

As noted above, Count III of the amended complaint alleges that Gettysburg Hospital is vicariously liable for the negligence of its "agents (actual, apparent, ostensible) including but limited to, its physicians, residents, interns,

nurses, and other allied support medical services personnel . . . ." The only agent expressly identified was Dr. Shah. Specifically, paragraph 42 avers that the hospital's agents were negligent for:

(a) Failing to use sterile procedures, thereby exposing Johanna Collins to the hepatitis B infection;

(b) Failing to properly train and supervise personnel under its control in the proper procedure for sterilization and control of infectious disease;

(c) Failing to implement and/or enforce hospital protocols, policies, and standard procedures regarding the prevention of transmission of infectious disease and proper methods of sterilization;

(d) Failing to properly and timely diagnose and treat plaintiff's decedent, Johanna Collins;

(e) Failing to timely take diagnostic tests of Johanna Collins, which were indicated due to the signs and symptoms with which she presented to the hospital;

(f) Improperly discharging Johanna Collins on June 28, 1993, when defendant knew or should have known of the infectious process, which ultimately led to her death;

(g) Disregarding hospital protocols, policies, and standard procedures regarding proper methods and practices to be utilized in the care of a patient diagnosed with hepatitis B.

The main thrust of the motion for summary judgment as it relates to Count III is the hospital's contention that plaintiff has not established that any of the hospital's agents are liable for the harm caused decedent. Gettysburg Hospital acknowledges that general agency principles apply to hospitals and physicians. *Simmons v. St. Clair*

*Memorial Hospital,* 332 Pa. Super. 444, 450, 481 A.2d 870, 873 (1984), but also points out that plaintiff has the burden of proving the existence of an agency relationship between the hospital and an agent. *Scott v. Purcell,* 490 Pa. 109, 117 n.8, 415 A.2d 56, 60 n.8 (1980). In order to establish actual agency between a physician and a hospital, it must be shown that the hospital controlled or had the right to control the physical conduct of the physician in the performance of his work. *Simmons v. St. Clair Memorial Hospital, supra,* 332 Pa. Super. at 452, 481 A.2d at 874. There is no evidence in the record of any actual agency between the hospital and anyone directly related to decedent's care at the hospital during the relevant time period. The only persons specifically identified in the record before the court as having medical involvement with decedent while at Gettysburg Hospital are Dr. Lorenzo in December 1992, Dr. Maxwell in April 1993, and Drs. Shah and Bajaj in June 1993. Based upon plaintiff's position that the hepatitis incubation period would not exceed three months, it does not appear that plaintiff is even remotely suggesting that acts of Dr. Lorenzo in any manner bind the hospital in this case. There is nothing in the record presently that indicates that the other identified physicians were anything except independent physicians with hospital privileges. Indeed, plaintiff appears to be relying upon the concept of an ostensible agency. The theory of ostensible agency was first adopted in Pennsylvania in *Capan v. Divine Providence Hospital,* 287 Pa. Super. 364, 430 A.2d 647 (1980). Normally, an employer is not liable for the torts committed by an independent contractor in his employ. Ostensible agency is based upon section 429 of the Restatement (Second) of Torts, which provides:

"One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants."

Thus, a physician who holds independent contractor status with a hospital may, nevertheless, be considered an agent of the hospital with respect to a patient. *Simmons, supra,* 332 Pa. Super. at 452, 481 A.2d at 873. Two factors relevant to a finding of ostensible agency in a particular case are (1) whether the patient looks to the institution rather than the individual physician for care, and (2) whether the hospital "holds out" the physician as its employee. The second factor is met when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees. *Capan, supra,* 287 Pa. Super. at 368, 430 A.2d at 649.

In *Capan* the decedent appeared at the hospital's emergency room because of a severe nosebleed. After being admitted, he developed delirium tremens and became violent. Several days later, when decedent again became violent in his room, the nursing staff summoned Dr. Pollice who was on call to cover emergencies. The doctor administered medication to calm the decedent who later that evening experienced cardiac arrest and died. An issue in the case was whether Dr. Pollice was an employee of the hospital when he treated the decedent. The Superior Court stated that a jury could have reasonably determined both factors to be present; specifically

that Dr. Pollice was treating the decedent as "house physician" rather than as his personal physician and that the hospital held Dr. Pollice out as its employee.

Here, Gettysburg Hospital argues that decedent commenced her involvement with Dr. Shah at his office and as her personal physician. While that certainly may be true, our examination of the hospital's liability is not limited to whether Dr. Shah is an agent of the hospital. Instead, based upon the allegations of negligence set forth in paragraph 42, we must also determine whether Dr. Maxwell was an employee or agent of the hospital when the Groshong port was inserted into decedent and whether Dr. Bajaj was an employee or agent of the hospital when examining and discharging decedent from the hospital. We have been presented with no information other than the bare allegations mentioned in this opinion about the involvement of Drs. Maxwell and Bajaj.

When responding to a motion for summary judgment Pa.R.C.P. 1035.3 provides, in pertinent part, that

"(a) The adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response . . . identifying

"(1) one or more issues of fact arising from evidence in the record controverting evidence cited in support of the motion . . . , or

"(2) evidence in the record establishing the facts essential to the cause of action . . . which the motion cites as not having been produced."

We have carefully examined plaintiff's responses to the motion for summary judgment and frankly can find no evidence or factual issue supporting plaintiff's position that Drs. Shah, Maxwell or Bajaj were agents of the hospital.

Plaintiff argues that the expert reports clearly identify the insertion of the Groshong port at Gettysburg Hospital as one of two most likely sources for decedent's hepatitis and that hepatitis is not contracted in a medical setting in the absence of negligence. Plaintiff also argues that Drs. Shah and Bajaj provided services to decedent while she was in the hospital. These arguments, however, miss the mark. The issue before the court respecting Count III is not whether there is sufficient evidence of negligence but whether there is evidence of agency. We do not believe that *Capan* was intended to be read as supporting the proposition that if a physician sees a patient in a hospital setting that no further evidence is necessary to establish ostensible agency. We believe more is required but that the record available to the court does not provide more.

Accordingly, we are compelled to grant the hospital's motion for summary judgment as to Count III.

Count IV of the amended complaint alleges corporate liability on the part of Gettysburg Hospital. Specifically, plaintiff avers that the hospital breached its nondelegable duty to decedent to render reasonable, competent, proper, adequate and appropriate medical and diagnostic care, advice, services and treatment (para. 47); to use reasonable care in the maintenance of safe and adequate facilities (para. 48); to select and retain only competent physicians (para. 49); to oversee all persons practicing medicine in the hospital (para. 50); and to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients (para. 51).

A cause of action for corporate liability with respect to hospitals was first adopted in Pennsylvania in *Thomp-*

*son v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). Therein, the court stated,

"Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

"The hospital's duties have been classified into four general areas: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment . . . ; (2) a duty to select and retain only competent physicians . . . ; (3) a duty to oversee all persons who practice medicine within its walls as to patient care . . . ; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients . . . ." 527 Pa. at 339-40, 591 A.2d at 707. (citations omitted)

In addition, the Supreme Court made it clear that for a hospital to be liable under a theory of corporate negligence it must be shown that "the hospital had actual or constructive knowledge of the defect or procedures which created the harm" and that "the hospital's negligence must have been a substantial factor in bringing about the harm to the injured party." 527 Pa. at 341, 591 A.2d at 708.

Gettysburg Hospital's motion for summary judgment contends that plaintiff has failed to establish, through expert evidence, that the hospital violated any of the four nondelegable duties. Based upon the record, we are compelled to agree.

Before discussing the record, we consider it worthwhile to examine several principles which have developed in the case law since *Thompson*. In *Edwards v. Brandywine Hospital,* 438 Pa. Super. 673, 652 A.2d 1382 (1995) the Superior Court noted that hospital corporate liability does not impose strict liability and is not triggered every time some harm comes to a patient in a hospital setting. Also, more must be shown than the negligent act of a person for whom the hospital is responsible. It is the breach of the corporate duty that is at issue and not whether its agent or employee erred. Instead, the hospital's negligence is "measured against what a reasonable hospital under similar circumstances should have done." 438 Pa. Super. at 683, 652 A.2d at 1386.

In *Edwards* a heparin lock was installed into the patient's hand as a point to introduce multiple intravenous fluids. The lock remained unchanged for three to four days. After being discharged, the patient complained of a red spot where the lock had been inserted. An emergency room doctor took a specimen from the area and reported the lab results of a staph infection in the patient's chart. Later, the patient complained of leg pains. A second test also revealed the staph infection. Treatment continued for over two years. The patient raised numerous claims of corporate negligence. The claims that the ER doctor should have put him on intravenous antibiotics immediately, that a physician failed to notice the results of the lab test in his chart, and that he was discharged prematurely were rejected because, at most, they alleged individual physician negligence, without evidence that the hospital knew of the alleged mistakes or that a reasonable hospital would have intercepted and corrected them. The claim that the hospital's policy requiring cath-

eters to be removed within 72 hours did address an issue of corporate negligence because it focused on the hospital's duty to adopt proper policies. The Superior Court illustrated the difference between individual and corporate negligence by stating,

"If Mr. Edwards' nurse should have known to change the heparin lock site after 48 hours but failed to, then Mr. Edwards could sue the hospital for this individual's negligent act under respondeat superior. If the hospital itself (through its official committee on infection control) adopts a substandard rule for changing intravenous catheter sites, then it may be liable in its corporate capacity. A nurse following hospital rules cannot be faulted, but the hospital can if it knew or should have known that [the] catheter rule was inadequate." 438 Pa. Super. at 685-86, 652 A.2d at 1387.

Likewise, in *Welsh v. Bulger,* 548 Pa. 504, 698 A.2d 581 (1997) our Supreme Court wrote that,

" 'Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence.' . . . Instead, corporate negligence is based on the negligent acts of the institution. . . . A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees." 548 Pa. at 513, 698 A.2d at 585. (citations omitted)

Where the hospital's negligence is not obvious the plaintiff must present expert testimony that the hospital's conduct deviated from the accepted standard of care and

that the deviation was a substantial factor in causing the harm. In *Welsh,* Bobbi Jo Welsh was under the prenatal care of Dr. Bulger who had obstetrical, but not surgical, privileges at Nason Hospital. While undergoing premature delivery, complications arose with the child. Dr. Bulger vaginally delivered the child. Expert reports suggested that patterns on the fetal monitoring readout indicated that the umbilical cord had become compressed and the fetus was not receiving sufficient blood flow. Immediate surgical delivery should have been performed. Several claims of corporate negligence were considered viable. First, the expert opinion that the nurses should have known there was a problem with the delivery and notified the hospital of the need for surgery was sufficient to support a prima facie claim of corporate negligence for the hospital's failure to oversee all persons (*i.e.* Dr. Bulger) who practice medicine within its walls. Second, the expert opinion that the hospital breached the standard of care by not having a qualified surgeon available during Dr. Bulger's deliveries was also sufficient to support a prima facie claim of corporate negligence for breaching its duty to select and retain only competent physicians and its duty to formulate policies to ensure quality care.

A cause of action for hospital corporate negligence must be supported by expert testimony that the hospital deviated from the accepted standard of care and that the deviation was a substantial factor in causing the plaintiff's injuries, unless there is an obvious causal connection between the alleged negligent act and the injury. *Welsh v. Bulger, supra,* 548 Pa. at 513-14, 698 A.2d at 585; *Matthews v. Clarion Hospital,* 742 A2d 1111, 1112 (Pa. Super. 1999). In the matter sub judice, we believe that

expert testimony is required in order to establish a hospital's duty with regard to protecting patients from contracting hepatitis and with regard to when and under what circumstances a patient should be discharged. The manner in which hepatitis can be contracted, the steps necessary to prevent the infection, and considerations associated with the discharge of a hospital patient are not matters of common knowledge. Whether plaintiff's decedent's infection and death resulted from a deviation in the standard of care is not obvious. Plaintiff has submitted the reports of three medical experts to support his claim of corporate negligence.

A close reading of Dr. Munoz' report indicates that, based upon a three-month incubation period, it is "very unlikely" for decedent to have contracted hepatitis before April 1993 and that thereafter the "most likely sources" of the contamination included the insertion of the port and the chemotherapy injections. He further opined that the delay in performing "relevant serologic and biochemical investigations" after the June 14 liver profile was so elevated that it "cannot be considered consistent with standard medical practice." Finally, he criticized Drs. Shah and Bajaj for discharging decedent on June 28 based upon her condition at that time.

When examining Dr. Munoz' report in light of the *Thompson* criteria, we find that he, in no manner, implicated the hospital in respect to its corporate duties. Specifically, he offers no opinion on how the hospital failed to maintain safe facilities, that it selected or retained incompetent physicians, that it failed to oversee persons who practiced within its walls or, that it failed to adopt and enforce proper policies. He failed to opine what a reasonable hospital would have done that Gettysburg

Hospital failed to do. The mere assertion that an infection was acquired is not sufficient because there could be numerous sources from which the patient could contract hepatitis in the hospital beyond the scope of the corporate duties to the patient. Errors in diagnosis and post-diagnosis without demonstrating corporate involvement or corporate indifference is likewise insufficient. At most, Dr. Munoz points to the individual negligence of Drs. Maxwell, Shah and Bajaj rather than to a breach of the corporate duties to decedent. This type of evidence misses the mark for corporate negligence.

The report of Dr. Glover is likewise insufficient to establish a prima facie case for corporate negligence. She opined that there was a deviation in standard medical practice (1) when Dr. Shah delayed in giving decedent Neupogen several days prior to her hospital admission; (2) when Dr. Shah gave decedent Tylenol while she was in the hospital; and (3) when decedent was discharged from the hospital on June 28 with worsening liver functions. The first and second deviations clearly are addressed to Dr. Shah's individual conduct and Dr. Glover makes no mention that the hospital acted negligently regarding those issues. Regarding the third deviation, although Dr. Glover does not expressly state who was responsible for the discharge, we know from other sources in the record that Drs. Shah and Bajaj were responsible for that decision. Significantly, Dr. Glover does not mention that the hospital failed to properly oversee the discharge, that it had inadequate discharge procedures, or that procedures were not knowingly followed.

Finally, the reports of Dr. Ashby are no more enlightening. The only hints of Gettysburg Hospital in her reports are the following references: (1) decedent's hepa-

titis "was acquired through the placement of the mediport catheter or the administration of chemotherapy;" (2) "This type of infection due to medical treatment does not occur in the absence of deviation from the standard of care. It is therefore my opinion, to a reasonable de-gree of medical certainty, that [decedent's hepatitis] was the result of deviations in her care and treatment by the medical care she received in and around treatment for her breast cancer, both at Gettysburg Hospital and/or Dr. Shah's office and/or their employees;" (3) during the hepatitis incubation period "the only thing that occurred which that [sic] could have caused her hepatitis B infec-tion where [sic] insertion of the Groshong port at Gettysburg Hospital and chemotherapy treatments with Dr. Shah;" and (4) "It is further my opinion that the hos-pital personnel and Dr. Shah and his office deviated from accepted standards of medical care in failing to take ap-propriate steps to prevent this infection." As with the other reports, Dr. Ashby did not indicate what corporate duty the hospital breached nor can we decipher one from her reports. She did not indicate the standard of care ap-plicable to a hospital, that any policies were inappropri-ate, nor that Gettysburg Hospital had actual or construc-tive knowledge that any of its policies were being violated.

Before concluding this discussion, we feel compelled to discuss whether the doctrine of res ipsa loquitur keeps the door to trial open for plaintiff on Count IV as it re-lates to whether Gettysburg Hospital is liable to plaintiff because its negligence resulted in decedent contracting the hepatitis infection.

The doctrine of res ipsa loquitur was first adopted in Pennsylvania in *Gilbert v. Korvette's Inc.,* 457 Pa. 602,

327 A.2d 94 (1974) and applied to medical malpractice cases in *Jones v. Harrisburg Polyclinic Hospital,* 496 Pa. 465, 437 A.2d 1134 (1981). The doctrine is defined in section 328(D) of the Restatement (Second) of Torts and states that,

"(1) It may be inferred that the harm suffered by the plaintiff is caused by the negligence of the defendant when

"(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

"(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

"(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

"(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

"(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached."

One must be cautious, however, in applying the doctrine for it "is neither a rule of procedure nor one of substantive tort law. . . . it [is] only a shorthand expression for circumstantial proof of negligence—a rule of evidence." *Jones,* 496 Pa. at 471, 437 A.2d at 1136. In a medical malpractice case, expert testimony will be required to establish the three criteria set forth in section 328(D), except in those limited circumstances where the information is obvious even to non-medically trained persons. *Hightower-Warren v. Silk,* 548 Pa. 459, 698 A.2d 52 (1997); *Brophy v. Brizuela,* 358 Pa. Super. 400, 517

A.2d 1293 (1986). Again, we refer to the reports of Drs. Munoz, Glover and Ashby. As to the first criteria, only Dr. Ashby (in her April 27, 2000 report) states that "This type of infection due to medical treatment does not occur in the absence of deviation from the standard of care." Thus, if the virus was transmitted in a medical setting, it had to have been as the result of negligence. For the sake of this discussion, we are satisfied from a careful reading of all of plaintiff's expert reports that the second and third elements can be satisfied.

The problem one faces in applying res ipsa loquitur in this case is, as noted above, that Dr. Ashby fails to indicate who is negligent in that hospital setting (*i.e.* agents or employees of the hospital or an independent physician) or whether that negligence implicates any of the nondelegable duties owed by a hospital to its patients. Without that connection it would be improper to allow this case to proceed just because plaintiff's expert states one does not contract hepatitis in a hospital setting absent negligence. It is quite possible for hepatitis to be transmitted by persons whose activities do not fall within the reach of corporate liability.

Plaintiff contends he can overcome this problem pursuant to the "alternate liability theory" founded upon section 433(B)(3) of the Restatement (Second) of Torts and adopted in Pennsylvania by *Snoparsky v. Baer,* 439 Pa. 140, 266 A.2d 707 (1970) and *Sommers v. Hessler,* 227 Pa. Super. 41, 323 A.2d 17 (1974). Section 433B provides, in pertinent part,

"Burden of proof

"(1) Except as stated in subsections (2) and (3), the burden of proof that the tortious conduct of the defen-

dant has caused the harm to the plaintiff is upon the plaintiff. . . .

"(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each actor to prove that he had not caused the harm."

As a matter of law, we do not believe this theory is applicable to the matter sub judice. As observed in *Mellon v. Barre-National Drug Co.,* 431 Pa. Super. 175, 182, 636 A.2d 187,190 (1993):

"This theory of liability was adopted in Pennsylvania by *Snoparsky v. Baer,* 439 Pa. 140, 266 A.2d 707 (1970), and *Sommers v. Hessler,* 227 Pa. Super. 41, 323 A.2d 17 (1974). Each of these cases and others where this theory has been applied, have determined that it can only be a basis for liability where there is a showing that there was group negligence on the part of several defendants but where it could not be established which of those defendants was personally responsible for the injuries incurred. . . ."

Thus, the key element is group negligence. We refer to comment g to section 433(B) which states that subsection (3)

"[H]as no application to cases of alternative liability, where there is no proof that the conduct of more than one actor has been tortious at all. In such a case the plaintiff has the burden of proof as to the tortious conduct and as to the causal relationship." *Pennfield Corp. v. Meadow Valley Electric Inc.,* 413 Pa. Super. 187, 194-95, 604 A.2d 1082,1086 (1992). (emphasis omitted)

Several cases are illustrative of the threshold that must be established for a case to proceed under the alternate liability theory and for the causation burden to shift to the defendants. In the leading case of *Summers v. Tice,* 33 Cal. 2d 80, 199 P.2d 1 (1948), the theory was applicable where two hunters simultaneously shot at a quail and the plaintiff was struck in the eye by a single pellet from one of the guns. The plaintiff was allowed to amend the complaint to avoid dismissal in *Snoparsky v. Baer, supra,* where the minor plaintiff was struck in the eye by a stone at a time when seven or eight boys were throwing stones in her direction. In *Sommers v. Hessler, supra,* plaintiff was injured in the eye by a "spit-ball" thrown by one of several minor passengers on a bus. The court stated,

"Furthermore, it is undisputed that the minor plaintiff suffered injury as a result of being struck by one of the 'spit balls.' While the [plaintiff] could not pinpoint which of the boys caused the actual injury, this does not absolve the student additional defendants of liability. It was foreseeable that from their combined acts someone might get injured. The burden of identifying the boy who caused the injury should not be on the bus company but should be 'upon each actor to prove that he has not caused the harm.' . . . If the defendants are unable to identify the one causing the harm, they are all liable as joint tortfeasors. Restatement (Second) of Torts §433B." 227 Pa. Super. at 46, 323 A.2d at 19. (citation omitted)

The more recent cases of *Pennfield Corp. v. Meadow Valley Electric Inc., supra,* and *Mellon v. Barre-National Drug Co., supra,* illustrate situations where the threshold for the alternate theory was not satisfied. In *Pennfield,* swine owned by Pennfield were suffocated when an elec-

trically operated ventilation system failed. Pennfield sued Meadow Valley, which repaired and maintained the electrical system. Meadow Valley joined Tri-State Electric and YESCO, one of whom supplied defective electrical cable. Tri-State filed preliminary objections in the nature of a demurrer, which were sustained. The Superior Court stated,

"[Meadow Valley] would have us believe that under subsection (3), because it cannot prove that either YESCO or Tri-State harmed it, the burden is on YESCO or Tri-State to prove that they were not the tort-feasor. This is a mischaracterization of the law. The predicate for applying subsection (3) is that 'the conduct of two or more actors is tortious.' Restatement (Second) of Torts §433(B)(3), *supra.* Subsection (3) is based on the rationale that 'injustice [lies in] permitting proved wrongdoers, who among them have inflected an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm.' Restatement (Second) of Torts, §433B(3), comment f. Here, [Meadow Valley] has not alleged that the conduct of two or more actors is tortious. Rather, [Meadow Valley] asserts one actor may be tortious while admitting the other actor may not be tortious. It is quite obvious from the rule and the rationale that the burden of proof remains on [Meadow Valley] and subsection (3), *supra,* does not apply." 413 Pa. Super. at 194, 604 A.2d at 1085. (footnote omitted)

Finally, in *Mellon, supra,* the plaintiff sued several defendants which the plaintiff claimed included all known manufacturers of syrup of ipecac, which contains eme-

tine, a toxin that allegedly caused the death of the minor-decedent. Plaintiff could not identify which defendant manufactured the ipecac actually digested by the decedent. The Superior Court held that a theory of liability based upon section 433B(3) does not apply in this situation.

In the matter sub judice, we are not faced with group negligence all directed toward decedent. Plaintiff's expert, Dr. Ashby, opined that the "hepatitis infection was acquired through the placement of the mediport catheter *or* the administration of the chemotherapy." (emphasis added) The plaintiff must prove that the conduct of *each* defendant is tortious for the theory to apply. As stated above, plaintiff has not established a record which supports the corporate negligence of the Gettysburg Hospital independent of section 433(B). Without such a showing the burden cannot be shifted to the hospital to show that it was not the source of the infection.

There is no question that the death of Johanna Collins was tragic and untimely. In granting the hospital's motions, we do so cautiously and with much hesitation. If, indeed, liability exists on the part of the hospital and it is permitted to escape its responsibility to decedent, the tragedy is compounded. However, it would likewise be tragic to expose the hospital to the expense of trial and potential liability where sufficient proof has not been established. Judges are frequently stressed when attempting to balance justice and law, knowing that the wrong decision could have dire consequences. While it would be easy to deny the hospital's motion on the basis of sympathy, our duty requires otherwise.

Accordingly, we enter the attached order.

## ORDER

And now, August 27, 2001, the motion for summary judgment filed by Gettysburg Hospital is granted and Counts III and IV of the amended complaint are dismissed.